368 So.2d 699 (1979)
STATE of Louisiana
v.
Johnny LAWRENCE.
No. 63005.
Supreme Court of Louisiana.
March 5, 1979.
Jerry B. Daye, Vidalia, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., W. C. Falkenheiner, Dist. Atty., for plaintiff-appellee.
*700 DIXON, Justice.[*]
On July 27, 1977 Barbara Roberts was discovered dead in her home located about a mile outside of Vidalia, Louisiana. In the course of the investigation, the police discovered that Tobe Roberts, her husband, had hired two men, Johnny Lawrence and David Albert, to stand guard over the house. When first picked up by the police for questioning on August 13, 1977, Lawrence admitted having been to Roberts house on several occasions, but stated that he had been in New Orleans on the night in question. However, at a second interview on August 26, 1977, Lawrence substantially changed his story and stated that on the night of the murder he had been guarding the Roberts house from his usual post in the barn. In this statement, Lawrence related that he had heard gunshots early in the morning and had seen David Albert climbing out of a back window of the house. Albert told the defendant that he had just killed Barbara Roberts, and the two then fled to dispose of their clothes and of the two pistols Albert had been carrying. After giving the statement, Lawrence led the police to the guns and clothing. Later that same evening he was arrested as a material witness, and on September 6, 1977 he was indicted as an accessory after the fact.
While incarcerated the defendant grew increasingly afraid that either Tobe Roberts or David Albert would attempt to harm him or his family. On November 3, 1977 the defendant, his attorney and the district attorney went to the Roberts home where the defendant gave a different account of the crime. In this version, the defendant stated that he had hidden under the kitchen table and had grabbed Barbara Roberts when she entered the house. David Albert then allegedly knocked the victim to the floor and shot her. When Lawrence asked Albert why he had killed Mrs. Roberts, Albert replied that a pending divorce had driven Tobe Roberts to contract for his wife's murder.
On November 30 and December 1, 1977 Lawrence was called by the state to testify in the first degree murder trial of David Albert. During the second day of trial, Lawrence suffered an acute attack of anxiety while on the witness stand which rendered him incoherent. His inability to testify further resulted in the declaration of a mistrial. Soon afterward the Concordia Parish Grand Jury indicted the defendant for first degree murder, to which charge the defendant entered pleas of not guilty and not guilty by reason of insanity on December 7, 1977. On the same day the trial judge appointed a sanity commission composed of Dr. Hugh King and Dr. Joe B. Hayes, staff members at the Central State Hospital in Pineville. Their report declared Lawrence incapable of proceeding because he lacked the mental capacity to understand the nature of the proceedings against him and was unable to assist in his defense. C.Cr.P. 641. After reviewing the report, the trial judge on December 27 ordered the defendant to the forensic unit at the East Louisiana State Hospital in Jackson.
In late April, 1978 the hospital staff informed the concerned parties that the defendant was now thought to have the requisite capacity to proceed to trial. On May 2, 1978 the court appointed a second sanity commission composed of Dr. A. P. Abad and Dr. Retus Osborn, staff members at the Jackson facility. A contradictory hearing was held three weeks later at which the trial judge determined that Lawrence had the mental capacity to proceed. The defense noted its objection to the ruling and sought supervisory writs from this court which were denied on June 15, 1978. 359 So.2d 624 (La.1978). Defense counsel then filed a motion to suppress, a motion for a change of venue, and a motion for a continuance, but all were denied on June 19. Two days later, Johnny Lawrence pleaded guilty to second degree murder, reserving the right to appeal the question of his capacity to stand trial at that time.
*701 Mental capacity to proceed is not present when the defendant, as a result of mental disease or defect, is unable to understand the proceedings against him or to assist in his defense. C.Cr.P. 641. However, this court has consistently held that such incapacity must be shown by the defendant by a clear preponderance of the evidence. State v. Veal, 326 So.2d 329 (La. 1976); State v. Flores, 315 So.2d 772 (La. 1975). Although a trial judge's determination of capacity to stand trial is entitled to great weight, State v. Morris, 340 So.2d 195 (La.1976); State v. Flores, supra, the trial judge may not rely so greatly on the medical testimony that he abandons the ultimate decision on competency to the medical experts. State v. Bennett, 345 So.2d 1129 (La.1977).
In State v. Bennett, supra, we articulated several factors which the trial judge should consider while evaluating the defendant's ability to stand trial. Pertinent inquiries to determine whether the accused can understand the proceedings against him include: his awareness of the nature of the charge and his appreciation of its seriousness; his understanding of available defenses; his ability to distinguish between pleas of guilty and not guilty and the consequences of each; his awareness of legal rights; and his comprehension of the range of possible verdicts and of the consequences of conviction. In assessing the defendant's ability to assist in his defense, the trial judge should consider: the defendant's recall and relation of facts pertaining to his actions and whereabouts at certain times; his ability to assist counsel in locating and examining witnesses; his maintenance of a consistent defense; the defendant's ability to inform his attorney of any distortion of misstatements in the testimony of the other witnesses; his capacity to make simple decisions in response to well-explained alternatives; the defendant's ability to testify in his own defense; and whether his mental condition will deteriorate under the stress of trial. With these functional considerations in mind, we must evaluate the evidence put forward at the second sanity hearing and the trial judge's decision based upon it.
Hospital records from East Louisiana State Hospital indicate that Lawrence was in a state of gross anxiety upon his arrival and could communicate only to deny any part in the murder of Barbara Roberts. Medical evaluations made in January and February, 1978 described the defendant as guarded, anxious, evasive and unable to communicate. A psychological examination conducted on February 20 placed Lawrence in the mildly retarded range with a gross score of 62 on the Wechsler Adult Intelligence Scale, which was further broken down into a verbal I.Q. of 69 and a performance I.Q. of 58. The test revealed a marked impairment of the defendant's associative flexibility when faced with a new situation and of his ability to size up and comprehend a total situation. Lawrence also performed poorly on the Bender-Gestalt figure drawing test. The test concluded that Lawrence had the intellectual ability of a fifth grader and suggested that an organic dysfunction could be affecting his visual-motor coordination.
A second examination of the defendant was conducted on March 11, 1978. The report described Lawrence as exhibiting great anxiety and uncertainty and a poor organization of his thoughts and ideas. The defendant, who had only a third grade education and cannot read and write, displayed a very limited fund of knowledge and did not know all the months of the year or the meanings of common proverbs. On the other hand, the report indicated that Lawrence was coherent during the examination, did not make loose associations, and did not suffer from delusions and hallucinations. He was also oriented to time, place and person, and could identify the President of the United States and the Governor of Louisiana. His memory appeared fairly accurate in that he could repeat a series of numbers called out to him. The general impression of the examiner was that the defendant was more cooperative, communicative and alert and had improved since his admission to the forensic unit.
Subsequent hospital reports indicate a continuous improvement in Lawrence's *702 mental state. Although an initial EEG raised the possibility of some organic dysfunction, a second test conducted on March 13 was normal. A report dated April 19, 1978 stated that Lawrence understood the charges against him and their possible consequences, and that he realized his better chances of being acquitted on the first degree murder charge than on the charge of accessory after the fact. The report concluded that the defendant had the capacity to cooperate and communicate with his attorney because he was accurately measuring reality, although some problems in communication could arise because he continued to "project and isolate" to some degree.[1]
Dr. Retus Osborn and Jerry Daye, the defendant's attorney, were the only witnesses at the sanity hearing. Dr. Osborn testified that in his opinion the defendant was recovering from an acute hysterical breakdown although he freely admitted that the first sanity commission had diagnosed the break as psychotic rather than neurotic. The doctor admitted that Lawrence continued to project and to isolate, but indicated that this was a problem common to many people. Osborn also stated that Lawrence was unable to comprehend the entire situation before him, but again stated that this was a common problem. According to the doctor, the defendant's ability to communicate possibly would be decreased by his lack of confidence in his own memory and by his tendency to overguard and to be flustered easily. The doctor also stated that Lawrence could possibly slip back into neurotic anxiety if he was not given Mellaril, a drug commonly used in the treatment of mental patients. Osborn stressed the importance of gaining Lawrence's confidence and admitted the possibility existed that the defendant would not be able to communicate outside of a clinical environment. Nevertheless, Dr. Osborn testified that the staff had conducted stress interviews with Lawrence and that the defendant was able to relate to the doctors and staff members even when angry. In Osborn's opinion, Lawrence had the ability to be selective and could choose what he wished to tell the person interviewing him. In short, Osborn considered Lawrence to have the ability to proceed, and believed any silence on his part to be a matter of preference.
Jerry Daye's testimony was in marked contrast to that of Dr. Osborn. Daye testified that the defendant still could not communicate effectively with him and still did not fully comprehend the charges or their consequences. In fact, Daye was of the opinion that Lawrence had practically no awareness of the consequences of the charges brought against him or of his legal rights.
A review of the evidence convinces us that the trial judge was not in error to declare Lawrence capable of standing trial. Although Lawrence is slightly retarded, mental retardation by itself is insufficient to establish the defendant's incapacity. State v. Morris, supra; State v. Augustine, 252 La. 983, 215 So.2d 634 (1968). The defendant may also be required to stand trial even if his mental capacity is maintained only through the use of prescribed drugs. State v. Hampton, 253 La. 399, 218 So.2d 311 (1969).
Moreover, Lawrence's inability to comprehend the entire situation confronting him does not necessarily lead to the conclusion that he could not understand the proceedings which he faced. Clearly Lawrence was possessed of sufficient intelligence to appreciate the nature of the first degree murder charge and its seriousness. His different statements to the police add credence to a conclusion that he understood what defenses could defeat the charges against himthat he either was not involved at all, or that he was unaware of the plot to kill Mrs. Roberts. According to Osborn, Lawrence also understood what pleas he could enter and was aware that the state would have a more difficult time convicting *703 him of first degree murder than as an accessory after the fact. Considering this evidence, the trial judge's conclusion that Lawrence understood the proceedings against him has ample support in the record before the court.
The record also contains sufficient evidence to support the trial judge's decision that Lawrence could assist in his defense. The facts of the case are not particularly complex, and Lawrence's defense would apparently have turned on whether he knew of the murder plot and on the extent to which he actually participated in it. The defendant's recorded statements were available to the defense, as was the testimony from the trial of David Albert. The addresses of the principal witnesses, Tobe Roberts and David Albert, were known to the defense. Although there is some evidence that Lawrence mistrusts his own memory and must have additional time to decide what response he will make to a given inquiry, the trial court apparently accepted Dr. Osborn's testimony that the defendant could communicate with his attorney if he wished. Moreover, the defense argument that Lawrence would not be able to notify his attorney of distortions or misstatements in the testimony of other witnesses is not such an important consideration if the defendant has already made numerous statements about the events in question. Defense allegations that Lawrence could not bear the stress of a trial are undercut by Dr. Osborn's testimony concerning stress interviews conducted by the staff at the forensic unit. It is also noteworthy that Lawrence's anxiety at the first trial apparently stemmed in part from fears that his and his family's lives were in danger from Roberts and Albert; the defense does not contend that this was still a possibility in June, 1978. In the light of these considerations, it appears that the trial court was correct in ruling that the defendant was capable of assisting counsel in his defense at the time of the second sanity hearing.
For the reasons assigned, the ruling of the district court finding Johnny Lawrence capable of standing trial is affirmed.
NOTES
[*] Judge Cecil C. Cutrer, Louisiana Court of Appeal, Third Circuit, participated in this decision as an Associate Justice Ad Hoc.
[1] Isolating was explained by Dr. Osborn as a process in which "the thinking of the individual tends to pick out one little thing and isolate it and blame it for everything instead of taking the whole problem."