514 So.2d 84 (1987)
STATE of Louisiana
v.
Adam COMEAUX.
No. 86-KA-1477.
Supreme Court of Louisiana.
September 9, 1987.
*86 William J. Guste, Jr., Atty. Gen., Charles F. Wagner, Dist. Atty., R. Greg Fowler, Asst. Dist. Atty., Thomas Yeager, Alexandria, for plaintiff-appellee.
Ralph W. Kennedy, Alexandria, for defendant-appellant.
MARCUS, Justice.
Adam Comeaux was indicted by the grand jury in separate counts for the first degree murder of Ida Voiselle and Ruby Voiselle Smith in violation of La.R.S. 14:30. After trial by jury, defendant was found guilty as charged on each count. A sentencing hearing was conducted before the same jury that determined the issue of guilt. The jury unanimously recommended that a sentence of death be imposed on defendant for each murder. The trial judge sentenced defendant to death in accordance with the recommendation of the jury.
On appeal, defendant relies on twenty-nine assignments of error for the reversal of his convictions and sentences. Fourteen of the assigned errors relate to the guilt phase; the remaining fifteen assigned errors relate to the penalty phase. Finding no reversible error in the assignments of error relating to the guilt phase, we affirm defendant's conviction on the two counts of first degree murder. However, finding reversible error in one of the assigned errors in the penalty phase (Assignment of Error No. 19), we reverse defendant's death sentences and remand to the district court for a new penalty hearing. Accordingly, we pretermit consideration of defendant's other assigned errors relative to the penalty phase of the trial.

FACTS
The victims in this case, sixty-three year old Ida Voiselle and seventy-two year old Ruby Voiselle Smith, were sisters and lived across the street from each other, at 725 Scott Street and 716 Scott Street respectively, in Alexandria. Miss Voiselle would often spend the night with Mrs. Smith at Mrs. Smith's home. On August 31, 1985, at about 8:30 p.m., Mrs. Edla Hess, the sister of Ida Voiselle and Ruby Smith, called and spoke to Ruby Smith, at which time she learned that Ida Voiselle would spend the night in Ruby Smith's residence. The next morning, at about 9:00 a.m., Mrs. Hess called to check on her sisters. Receiving no answer at the home of either sister, Edla Hess went over to check on them. When, after repeated knocking, neither sister answered her door, Edla Hess called the Alexandria Police Department to come and investigate the welfare of her two sisters.
Upon arrival, the police checked the house of Ruby Smith and noticed bloodstains on the rear door. They also found that the side window screen of the house had been torn and removed and that the window pane was broken with pieces of broken glass on the ground. The police noted blood on pieces of the broken glass pane still attached to the window. The police thereupon entered the Smith home through the rear door. In the dining room, they found the body of Ida Voiselle, face *87 down in a pool of blood. A short distance away, next to the bed in the front left bedroom, they found the almost completely nude body of Ruby Smith lying face up in a pool of blood. After the two bodies were preliminarily examined by the coroner, and after hair samples and rape kits were taken from the victims' bodies by crime scene investigators, the bodies were removed to Shreveport for examination by a pathologist. The pathologist determined that the cause of death for both victims was multiple traumatic injuries to the head and body received as a result of beating with a heavy, blunt object (later determined to be a cypress knee doorstop), resulting in shock and rapid blood loss. Additionally, in Ruby Smith, there was evidence of recent intercourse, ejaculation, and trauma to the genitalia probably resulting from the insertion of a flat, blunt instrumentality into the vagina.
The rape kits performed on the victims revealed non-secretor (i.e., non-blood group specific) seminal acid phosphatase and spermatozoa present on the vaginal swab of Ruby Smith. The sex crime suspect kit performed upon defendant indicated that he was a type-O non-secretor, consistent with the sperm found in Ruby Smith. Hair samples found on Mrs. Smith and at the scene of the crime possessed the same characteristics as those of the hair of defendant.
Pursuant to their investigation of the crime scene, the police officers took blood samples from the broken window pane, a gray oil drum used to gain access to the window, a washer and a dryer underneath the window inside the house, and a metal cabinet next to the washer and the dryer. The blood found on the oil drum and the metal cabinet was determined to be consistent with the blood type and characteristics of defendant. Latent fingerprints lifted from the broken glass from the window pane and from the dryer matched the fingerprints of defendant. Finally, footprints found in the pool of blood surrounding Ida Voiselle exactly matched one of a pair of tennis shoes seized from defendant.
At about 6:30 a.m. on September 1, 1985, defendant walked up to the cab of Michael Leroy Shafer at a bus station near the homes of the victims and requested to be taken to another bus station across town. Shafer drove defendant, who identified himself as "Adam," to the bus station, but the bus station was closed. Defendant then requested that Shafer drive him to Opelousas. On the trip to Opelousas, Shafer noticed that defendant had four cut marks on his lower right arm. Shafer also noticed that defendant appeared very nervous and kept looking behind the cab during the trip to Opelousas. Upon arriving in Opelousas, defendant asked Shafer to drive him to his home in Leonville.
Later that night, Shafer, after hearing of the murders on Scott Street, notified the authorities of the details of the ride. The next day, September 2, 1985, Shafer led Detectives Cicardo and Kitchen of the Alexandria Police Department and members of the St. Landry Parish Sheriff's office and the Leonville Police to the residence where he had dropped off defendant. The police were met by John Comeaux, defendant's father, who told them that his son Adam had arrived by cab the previous morning with cuts on his arm. Comeaux then told them defendant could be found at his brother's house down the road. Upon locating defendant, the police requested that he come with them. Defendant agreed and was taken to the Leonville City Hall.
After giving defendant his rights and advising him that he was not under arrest and was free to go at any time, the police attempted to question him. However, defendant was reluctant with his parents looking on in the relatively open City Hall and requested to be taken somewhere more private for questioning. Defendant was then taken to the St. Landry Parish Sheriff's office in Opelousas. At 8:08 p.m., defendant was again advised of his rights at the St. Landry Parish Sheriff's office, at which he signed a rights waiver form and gave a recorded statement concerning the two homicides. The statement was vague, but defendant admitted breaking into the house and hitting the two women. Pursuant *88 to this information, warrants for the arrest of defendant were issued and sent by teletype to the St. Landry Parish Sheriff's office. Defendant was formally arrested, read his rights, and booked at the St. Landry Parish Sheriff's office. Defendant was then transported to the Alexandria City jail where he was again advised of his rights and rebooked at 1:04 a.m. on September 3, 1985. Defendant indicated that he would give a statement in the morning. At 8:00 a.m. that morning, defendant, after again being advised of his rights, signed another rights waiver form and gave a detailed statement concerning the murders of Ida Voiselle and Ruby Smith. In a lineup later that morning, defendant was positively identified by Shafer as the person he had taken to Leonville. Defendant was then removed to the Rapides Parish Prison.

GUILT PHASE

Assignment of Error No. 1
Defendant contends the trial judge erred in denying his motion for individual, sequestered voir dire. He argues that extensive pretrial publicity in the local media required that the prospective jurors be called in this manner.
Despite evidence of several newspaper articles and radio and television broadcasts concerning the murders, the two victims, and the defendant, the trial judge denied the motion for individual voir dire. The trial judge did, however, state that he would have the voir dire conducted with panels of six or twelve prospective jurors at a time. (The voir dire was ultimately conducted in panels of six or fewer.) The trial judge stated that if he felt that any panel was contaminated, he would excuse the entire panel.
There is no provision in our law which either prohibits or requires the sequestration of prospective jurors for an individual voir dire. The manner in which the veniremen are called and the scope of examination are left to the court's discretion. La.Code Crim.P. art. 784; Id., Comment (c); La.Code Crim.P. art. 786; State v. Kirkpatrick, 443 So.2d 546 (La.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984); State v. Willie, 410 So.2d 1019 (La.1982), cert. denied, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984). The burden is on the defendant to show that the court abused its discretion in refusing to sequester the venire at voir dire. Kirkpatrick, supra. A trial court has the discretion to permit individual voir dire if a defendant can demonstrate that special circumstances are present. La.Code Crim.P. art. 3; State v. Lindsey, 404 So.2d 466 (La.1981). Absent special circumstances, the trial court does not err in refusing requests for individual voir dire. The fact that defendant's case is capital does not by virtue of that fact alone establish a "special circumstance" requiring a variation from the general rule of trial court discretion. State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985).
In the instant case, defendant did not meet his burden of showing special circumstances justifying individual, sequestered voir dire. The media coverage and publicity surrounding this case were not shown to be impermissibly extensive or prejudicial. Hence, the trial judge did not err in denying the motion for an individual, sequestered voir dire.
Assignment of Error No. 1 is without merit.

Assignment of Error No. 2
Defendant contends the trial judge erred in denying his motion to quash the indictment. He argues that the selection of a "death-qualified" jury pursuant to La. Code Crim.P. art. 798(2)[1] and Witherspoon *89 v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), results in a denial of his right to a jury drawn from a fair cross-section of the community, and further results in the impanelment of a conviction-prone jury in violation of his right to a fair and impartial jury.
In State v. Kirkpatrick, 443 So.2d 546 (La.1983), we stated:
La.C.Cr.P. art. 798(2) was amended to conform with the decision in Witherspoon v. Illinois, ... wherein the United States Supreme Court found that there was no constitutional bar to excluding jurors who stated in advance of trial that they could not even consider returning a verdict of death or that their attitude about the death penalty would prevent them from making an impartial decision as to defendant's guilt. [Citations omitted.]
. . . .
There is no merit to defendant's contention that his constitutional right to be tried by a jury selected from a fair cross-section of the community has been violated when prospective jurors have been properly excluded in compliance with La. C.Cr.P. art. 798(2) and Witherspoon v. Illinois, supra....
This court recently reaffirmed this position in State v. Jones, 474 So.2d 919 (La.1985), cert. denied, ___ U.S. ___, 106 S.Ct. 2906, 90 L.Ed.2d 993 (1986):
In Witherspoon v. Illinois, ... the Court stated that the data in support of a claim that death-qualified jurors are conviction prone was either non-existent or "too tentative and fragmentary" to warrant such a conclusion.... This court has consistently declined to adopt a contrary view. [Citations omitted.]
As in Jones, we note that
[i]n Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court recently "clarif[ied]" its decision in Witherspoon and adopted an arguably less stringent standard. The Court stated:
"That standard is whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that in addition to dispensing with Witherspoon's reference to `automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with `unmistakable clarity.' This is because determination of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made `unmistakably clear'...."
Nevertheless, we do not address the applicability of Wainwright in the instant case since we continue to hold that death-qualification of the jury under the more stringent standard of Witherspoon, as incorporated in La.Code Crim.P. art. 798(2), does not violate a defendant's constitutional right to a jury drawn from a fair cross-section of the community and does not result in the impanelment of a conviction-prone jury in violation of his right to a fair and impartial jury. Hence, the trial judge did not err in denying the motion to quash.
Assignment of Error No. 2 is without merit.

Assignments of Error Nos. 3 and 4
In these assignments of error, defendant contends the trial judge erred in denying his original motion to change venue and a subsequent motion to change venue urged after presentation of additional evidence. He argues that because of extensive pretrial publicity, such prejudice existed in the collective mind of the community that a fair trial was impossible.
A hearing was held several days prior to trial, at which time reports of electronic media coverage and copies of newspaper articles from the Alexandria Daily Town *90 Talk were entered in the record. These articles discussed not only the good reputation of the victims in the community but also defendant's past and present criminal background, including his detention in a juvenile home for an attempted aggravated rape committed as a juvenile. One of the articles stated that defendant was presently under suspicion for a similar rape and beating murder of an elderly woman in Hot Springs, Arkansas. Another article quoted excerpts from two confessions made by defendant. The trial judge denied the motion to change venue, stating that he did not find any evidence to indicate that the prospective jurors had been so tainted by the pretrial publicity that they would have a preconceived notion of guilt on the part of defendant. The next day, defendant reurged his motion to change venue, based upon an article which had appeared in the Daily Town Talk that morning. The article dealt primarily with the closure of the hearing on defendant's motion to suppress various statements made by defendant, but also quoted from one of those statements and alluded again to the Hot Springs murder. The trial judge again denied the motion.
The grounds for a change of venue are set forth in La.Code Crim.P. art. 622 which provides:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
In deciding whether to grant a defendant's motion for a change of venue, therefore, the trial judge must consider if prejudice, undue influence, or any other reason will deny the defendant a fair trial in the parish in which the prosecution is pending. The judge must also decide if such prejudice or influence will affect either the answers of the jurors on the voir dire examination or the testimony of the witnesses at trial. La.Code Crim.P. art. 622; State v. Clark, 442 So.2d 1129 (La.1983). The burden of proof is on the defendant to show that such prejudice exists in the collective mind of the community that a fair trial is impossible. Clark, supra; State v. Vaccaro, 411 So.2d 415 (La.1982). Under art. 622, the defendant must prove more than mere public knowledge of facts surrounding the offense to be entitled to have his trial moved to another parish. Whether defendant has made the requisite showing is a question addressed to the trial court's sound discretion which will not be disturbed on review in the absence of an affirmative showing of error and abuse of discretion. Vaccaro, supra.
In the instant case, we conclude that defendant did not meet his burden of proving that there existed such prejudice in the collective mind of the community that a fair trial was impossible. The newspaper articles and other media coverage were neither so extensive nor so inflammatory as to entitle defendant to a change of venue. Moreover, we note that, as a cautionary measure, the trial judge had the voir dire of prospective jurors conducted in panels of six or fewer so as to carefully screen for prejudicial exposure to publicity surrounding the case. Hence, the trial judge did not err in denying the motions to change venue.
Assignments of Error Nos. 3 and 4 are without merit.

Assignment of Error No. 5
Defendant contends the trial judge erred in finding that defendant had no mental disease or defect which would prevent him from understanding the proceedings against him or assisting in his own defense. He argues that he is mentally retarded and suffers from memory loss and personality disorders; therefore, he was incapable of standing trial.
La.Code Crim.P. art. 641 provides:

*91 Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense.
However, this court has consistently held that the defendant bears the burden of establishing such incapacity by a clear preponderance of the evidence. State v. Lawrence, 368 So.2d 699 (La.1979); State v. Vincent, 338 So.2d 1376 (La.1976). A conclusion that one is mentally retarded or defective or diseased does not of itself establish present insanity. However, when mental retardation or defect or disease, alone or in combination, is so severe that a defendant is unable to understand the object, nature, and consequences of the proceedings against him, to communicate with counsel in a meaningful manner, to recall and relate the circumstances connected with the offense, to testify in his own behalf, and to assist reasonably and rationally in a defense of the charge against him, that defendant is, within the contemplation of our law, presently insane and unable to stand trial. State v. Augustine, 252 La. 983, 215 So.2d 634 (1968). A trial judge's determination of capacity to stand trial is entitled to great weight, Lawrence, supra, and will not be disturbed on appeal absent abuse of discretion. State v. Hamilton, 373 So.2d 179 (La.1979).
In several pretrial hearings, Dr. Milton Rhea, a psychologist, testified that defendant is mildly mentally retarded with a tested I.Q. of 68. Dr. Rhea testified that although defendant had a mental age of eleven based upon intelligence, defendant's mental age based upon overall memory was only nine or ten, and his mental age based upon logical memory was only five. However, Dr. Rhea stated that during his interviews with defendant, defendant appeared intact and nonpsychotic. Although Dr. Rhea suspected a possible organic neurological dysfunction, a neurological examination conducted by Dr. Andrew Chesson resulted in a CT scan and an EEG which were within normal limits.
Dr. Sidney Strickland, a psychiatrist who examined defendant at the request of the state after defendant put his capacity to proceed at issue, effectively rebutted Dr. Rhea's testimony. Dr. Strickland stated that, although defendant was mildly mentally retarded and experienced some functional impairment as a result thereof, there was no evidence of psychosis, significant memory loss, or any other mental disease or defect which would make defendant unable to proceed. Finally, the reports of one Dr. Mullen, the examining psychiatrist at the Hilltop Residential Treatment Facility where defendant had spent some time, indicated that, at least at that time (a little more than a year before the hearing of the motion to determine capacity), defendant showed and had shown no psychotic symptoms, signs or symptoms of a thought disorder, reality distortions, or secondary symptoms, such as delusions or hallucinations.
We conclude that defendant did not carry his burden of proving mental incapacity to proceed. Hence, the trial judge did not abuse his discretion in holding that defendant was capable of standing trial.
Assignment of Error No. 5 is without merit.

Assignments of Error Nos. 6, 13, and 14
In this group of assignments of error, defendant contends the trial judge erred in denying his motion to suppress three inculpatory statements made by him and in admitting the tape of one of those statements and the rights waiver forms relating to the statements at trial over his objection. He argues that his mental retardation and low level of intelligence rendered him incapable of comprehending the nature of the Miranda warnings read to him and vitiated his ability to make a knowing and intelligent waiver of his constitutional rights.
In his motion to suppress, defendant sought to suppress the statements made by him on September 2, 1985 and September 3, 1985. He also sought to suppress an inculpatory statement made by him to Officer Cicardo on September 12, 1985, in which statement defendant confessed to the rape *92 and beating murder of an elderly woman in Hot Springs, Arkansas, only a week before the murders in the instant case. At the time of this statement, defendant had executed a rights waiver form, and Officer Cicardo was questioning defendant pursuant to an Arkansas warrant for defendant's arrest.
At the outset, we note that the state did not offer either the September 2, 1985 statement or the September 12, 1985 statement into evidence at trial. Hence, the question of whether the trial judge erred in failing to suppress these statements is moot, and we consider only the effect of the admission of the September 3, 1985 statement at trial.
In order for an inculpatory statement to be admissible in evidence against an accused at trial, the state bears the burden of establishing beyond a reasonable doubt that the statement was freely and voluntarily made. La.R.S. 15:451.[2] Once a trial judge has determined that the state has met its burden of proof, his decision is entitled to great weight on review. State v. Trudell, 350 So.2d 658 (La.1977). Moderate mental retardation and low intelligence or illiteracy do not of themselves vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. The crucial factor in all such cases is whether or not the defendant was able to understand the rights being explained to him. State v. Anderson, 379 So.2d 735 (La. 1980).[3]
At the hearing on the motion to suppress, extensive testimony as to defendant's mental condition was adduced by both the defense and the state.[4] Dr. Rhea, the defense expert, opined that because defendant's intelligence and reading levels are so low, the Miranda warnings on the rights waiver forms, even if read aloud to defendant, would probably not be comprehensible to him without additional explanation. However, Dr. Rhea refused to state that defendant was absolutely incapable of understanding the Miranda warnings as read to him from the rights waiver forms. Dr. Strickland, the expert for the prosecution, from inspection of the reports of Dr. Mullen and Dr. Chesson and from his own examination of defendant, concluded that defendant could understand the Miranda warnings contained in the rights waiver forms. Moreover, during the time period involved, defendant was advised of his Miranda rights at least five times. Neither Officer Cicardo nor any of the other officers who advised defendant of his rights saw any indication that defendant was under the influence of alcohol or drugs, suffered from a mental defect, or was otherwise unable to understand his rights. In fact, defendant affirmatively indicated the contrary by responding, "Yes, sir," when asked if he understood his rights.
Based on the evidence, we conclude that the state met its burden of proving beyond a reasonable doubt that the statement made by defendant on September 3, 1985 was made freely and voluntarily after a knowing and intelligent waiver of his constitutional rights. Hence, the trial judge did not err in failing to suppress that statement or in admitting the statement at trial, nor did he err in admitting the rights waiver forms.
Assignments of Error Nos. 6, 13, and 14 are without merit.

*93 Assignment of Error No. 7

Defendant contends the trial judge erred in denying his challenge for cause of prospective juror Charles R. Owens. He argues that Owens should have been excused for cause under La.Code Crim.P. art. 797(2) and (4)[5] because Owens indicated that he would automatically vote for the death penalty if he were convinced of defendant's guilt.
During the voir dire examination of Owens, defense counsel asked Owens whether, if the state proved the two counts of first degree murder, he would vote for the death penalty "sort of automatically." Owens replied, "If they prove that, ah, yes." Later, in the examination, Owens clarified his position:
Q [Defense Counsel] Well let me phrase the question again. In the event of a conviction by the State, would you vote for death just automatically?
A [Owens] Well, not just automatic. I would have ... as I indicated ... take into [account] all of the mitigating circumstances and the extenuating circumstances involved, and at that point, if I were still totally convinced of guilt, I would have no reservations about voting for capital punishment.
Defense counsel then challenged Owens for cause. In order to understand Owens' views more completely, the trial judge re-read to Owens the law applicable to the imposition of a sentence of death in Louisiana and asked him the following questions:
BY THE COURT: Do you understand the law of the State of Louisiana?
A I do.
BY THE COURT: All right, sir. Now, I think the question was asked that if you found that the defendant was guilt[y] as charged, would you then recommend the death penalty?
A Well....
BY THE COURT: Simply in the guilt phase, sir?
A No, not in the guilt phase.
BY THE COURT: All right.
A I ... maybe I'm just assuming that in the final, after everything is said and done, after all extenuating circumstances, all mitigating circumstances, have been taken into consideration, all evidence by the prosecuting attorney, and everything still convinced me of guilt, that I could vote for capital punishment. But I can't sit here and say that until I've heard all of that. But you're asking my philosophy more or less.
Defense counsel again challenged Owens for cause. The trial judge denied the challenge, whereupon defense counsel exercised a peremptory challenge to exclude Owens from the jury.
Where, as here, an accused has exhausted all of his peremptory challenges before completion of the panel, he is entitled to complain on appeal of a ruling refusing to maintain a challenge for cause made by him. State v. Monroe, 366 So.2d 1345 (La.1978). A defendant need show only two things to obtain reversible error: (1) that the trial judge erred in refusing to sustain a challenge for cause by the defendant, and (2) that the defendant exhausted all of his peremptory challenges, as he did in this case. State v. Albert, 414 So.2d 680 (La.1982). The trial judge is vested with broad discretion in ruling on a challenge for cause which ruling will not be disturbed absent a showing of abuse of that discretion. Monroe, supra.
Although Owens seemingly indicated at first that he would automatically vote for the death penalty in the event of a conviction, he subsequently clarified his position. The upshot of Owens' testimony, after a *94 recitation of the applicable law by the trial judge, was that although he could vote for the death penalty under the right circumstances, he would adhere to the law pertaining to aggravating and mitigating circumstances in making that decision and would not automatically impose the death penalty upon a showing of guilt. The law requires no more. The trial judge did not err in denying defendant's challenge of Owens for cause.
Assignment of Error No. 7 is without merit.

Assignments of Error Nos. 8 and 9
In these assignments of error, defendant contends the trial judge erred in sustaining the state's challenges for cause of prospective jurors Sherman Gistarb and Sandra Noel. He argues that because Gistarb and Noel were not completely opposed to the imposition of the death penalty in any case, there did not exist grounds for sustaining the state's challenges for cause under La.Code Crim.P. art. 798(2).[6]
Although Noel and Gistarb expressed no unalterable opposition to imposition of the death penalty in general, they nonetheless indicated that they would not recommend death upon conviction of a defendant who is partially or borderline mentally retarded. Ms. Noel indicated that she would be unable to impose a death penalty verdict on someone who was mildly or borderline retarded. Although Gistarb initially claimed to have no problem with the death penalty, he later stated that he did not think he would return a verdict of death against someone who has mild mental retardation. This opinion was confirmed in a later colloquy between the court and Gistarb:
BY THE COURT: [In the event the accused is shown to be a borderline retarded person], would that automatically then exclude you from voting for the death penalty? That one factor?
A Right. I think so. That would be true.
The trial judge sustained the state's challenges for cause of both Gistarb and Noel.
As pointed out by the United States Fifth Circuit Court of Appeals in Williams v. Maggio, 679 F.2d 381 (5th Cir. 1982), cert. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983):

Witherspoon and its progeny do not mandate that a prospective juror aver that she would refuse to consider the death penalty in every case that could possibly arise. If she knows enough about the case to know that she could not consider imposition of the death penalty regardless of what evidence might be presented, she must be excused.
Similarly, this court has held that where a prospective juror indicated that she would automatically vote against the death penalty except in the case of a mass murder on the scale of Adolph Hitler or Charles Manson, there was no abuse of discretion in the trial judge's conclusion that this disqualified her as a juror under La.Code Crim.P. art. 798(2). State v. Nicholson, 437 So.2d 849 (La.1983). We conclude that an unalterable opposition to imposition of the death penalty on borderline retardates (such as defendant here) gives rise to a valid challenge for cause under La.Code Crim.P. art. 798(2) and Witherspoon.[7] Hence, the trial judge did not err in excusing prospective jurors Gistarb and Noel for cause.
*95 Assignments of Error Nos. 8 and 9 are without merit.

Assignment of Error No. 10
Defendant contends the trial judge erred in denying his challenge for cause of prospective juror Sharon A. Jones. He argues that because of Ms. Jones' employment as a dispatcher with the Boyce, Louisiana Police Department, she was subject to a challenge for cause for partiality under La.Code Crim.P. art. 797(2).[8]
Ms. Jones stated on voir dire that although she was employed as a dispatcher at the Boyce Police Department, she was only a civilian employee. She stated that she only answered the phone and dispatched patrolmen to wherever there was a problem; however, the patrolmen never discussed the cases with her. She made it clear that her employment would not influence her decision in this case. The trial judge asked her whether her employment as a police dispatcher would make a difference as to whether she would be able to treat defendant fairly and impartially. She replied that it would not prevent her from being a fair and impartial juror. The trial judge denied the challenge for cause; defense counsel then exercised his sole remaining peremptory challenge. Having exhausted all of his peremptory challenges before completion of the jury panel, defendant is entitled to complain on appeal of a ruling refusing to maintain a challenge for cause made by him. State v. Monroe, 366 So.2d 1345 (La.1978).
Service on a criminal jury by one associated with law enforcement duties must be closely scrutinized and may justify a challenge for cause; however, such association does not automatically disqualify a prospective juror. State v. Sylvester, 400 So.2d 640 (La.1981). A juror's relationship to one associated with law enforcement only disqualifies him if the relationship is "such that one might reasonably conclude that it would influence the juror in arriving at the verdict." State v. Robinson, 353 So.2d 1001 (La.1977), quoting State v. McClure, 258 La. 999, 249 So.2d 109, 133 (1971). The trial judge is vested with wide discretion in appraising the impartiality of prospective jurors, and his ruling will not be disturbed on appeal absent a clear showing of abuse of that discretion. State v. Calloway, 343 So.2d 694 (La.1976).
In the instant case, Ms. Jones, a civilian employee, worked as a police dispatcher and was only very tangentially involved with actual law enforcement duties. Moreover, she unequivocally asserted that she could and would be able to decide the case fairly and impartially despite her employment with the Boyce Police Department. The trial judge did not abuse his discretion in denying defendant's challenge for cause.
Assignment of Error No. 10 is without merit.

Assignment of Error No. 11
Defendant contends the trial judge erred in denying his motion for a mistrial. He argues that because he did not receive the report on a neurological examination supporting a plea of insanity until ten jurors had been selected in his trial, there was no longer any basis for the withdrawal of his plea of not guilty under La.Code Crim.P. art. 561, and thus mistrial was the only remedy available to correct the legal defect in the proceedings.
Pursuant to defendant's motion for funds, the trial judge granted defendant $1,000 for neurological testing to develop any possible defense of lack of capacity to proceed or insanity at the time of the offense. That neurological testing was conducted from January 29, 1986 through January 31, 1986. At the time defendant's motion to determine capacity to proceed was heard on February 6 and 7, 1986, Dr. *96 Chesson, the examining neurologist, had not yet furnished his report to defendant, although both defense counsel and the prosecutor had spoken to Dr. Chesson over the telephone. Defense counsel was furnished with a copy of the neurologist's report at 1:15 p.m. on February 12, 1986, after ten jurors had been selected. On February 13, 1986, defendant moved for a mistrial on the basis that the previously unavailable neurologist's report supported a plea of not guilty and not guilty by reason of insanity. Defendant argued that because he was unable to change his plea from not guilty to not guilty and not guilty by reason of insanity and because, even if a change of plea were allowed, the jurors had not been examined on voir dire for their views on the insanity defense, the only remedy was a mistrial. The trial judge denied the motion. Defendant's application to the court of appeal for writs was denied. We likewise denied his application to this court, noting that "[i]n the event of conviction relator's assignment of error may be considered on appeal." State v. Comeaux, 481 So.2d 1356 (La.1986).
Defendant is correct in his assertion that he was barred from changing his plea from not guilty to not guilty and not guilty by reason of insanity. La.Code Crim.P. art. 561 provides:
The defendant may withdraw a plea of "not guilty" and enter a plea of "not guilty and not guilty by reason of insanity," within ten day after arraignment. Thereafter, the court may, for good cause shown, allow such a change of plea at any time before the commencement of the trial. [Emphasis added.]
Since trial had commenced,[9] art. 561 clearly prohibited a change of plea.
However, defendant is not correct in his assertion that the trial judge erred in denying his motion for a mistrial. Mistrial is a drastic remedy and, except in instances in which the mistrial is mandatory, is warranted only when a trial error results in substantial prejudice to the defendant, depriving him of a reasonable expectation of a fair trial. La.Code Crim.P. art. 775; State v. Russell, 352 So.2d 1289 (La.1977). In the instant case, defendant claims that the report on the neurological examination conducted by Dr. Chesson was the first indication that an insanity defense might be available to him. However, our examination of that report reveals no disclosures indicating a possible insanity defense. Indeed, the report contains very little more diagnostic information than that already available through the examinations previously conducted by the defense psychologist, Dr. Rhea. Moreover, the record shows that while the written report of Dr. Chesson was unavailable until voir dire had almost been completed, both defense counsel and the prosecutor spoke to Dr. Chesson by telephone about the examination some time prior to the commencement of trial. Hence, the trial judge did not err in denying the motion for a mistrial.
Assignment of Error No. 11 is without merit.

Assignment of Error No. 12
Defendant contends the trial judge erred in permitting the jury to view gruesome photographs of the two victims. He argues that the prejudicial effect of the photographs outweighed their probative value.
The photographs in question depict the two victims as initially discovered by the police. Photographs of Ida Voiselle show her lying face down in a pool of blood. Photographs of Ruby Voiselle Smith show her lying face up on the floor next to her bed, and almost completely nude with her clothes pulled over her breasts. Her body was bruised, and there were smears of blood on the body, as well as some pooling of blood around the body.
Generally, photographs of the body of a victim depicting the fatal wounds are relevant to prove the corpus delicti, to corroborate other evidence of the manner in which death occurred and to establish the *97 location, severity, and number of wounds, and the identity of the victim. The test of admissibility is whether the probative value of the photographs outweighs the prejudice which may result from their display to the jury. The circumstance that the photographs are gruesome does not of itself render them inadmissible. State v. Beach, 320 So.2d 142 (La.1975).
In the instant case, the photographs in question were clearly admissible to corroborate the manner in which the deaths occurred and the expert testimony establishing the cause of death as multiple traumatic injuries sustained as the result of beating. They also had probative value to show the condition in which the bodies were found in relation to other pieces of physical evidence and for the purpose of identifying the victims. Since one of the issues at trial was whether an aggravated rape had occurred, the photographs were also relevant to that issue, since they depicted the state of undress and the condition of the body of the alleged rape victim. Our review of the photographs confirms the finding of the trial judge that their probative value outweighs any possible prejudicial effect. Moreover, the photographs are not so gruesome as to "overwhelm reason" to associate the accused with the atrocity without sufficient evidence. State v. Watson, 449 So.2d 1321 (La.1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985), citing State v. Lindsey, 404 So.2d 466 (La.1981). Hence, the photographs were properly received in evidence.
Assignment of Error No. 12 is without merit.

PENALTY PHASE

Assignment of Error No. 19
Defendant contends the trial judge erred in permitting Dr. Sidney Strickland to testify as to evidence obtained from defendant in an interview conducted on February 7, 1986 without the knowledge, consent, or presence of defendant's appointed counsel. He argues that Strickland's examination of him violated his right to the effective assistance of counsel under the sixth amendment of the federal constitution.
On the morning of February 7, 1986, Dr. Strickland, a psychiatrist, went to the parish jail at the request of the prosecutor and spoke with defendant for an hour and fifteen minutes. Dr. Strickland later testified that he "did not talk about what [defendant] was charged with or anything like that [but rather] asked about the other things in his life, and really to try to test his memory and concentration." Defendant's appointed counsel was not notified that his client was to be examined by Dr. Strickland and was not aware that the examination had been conducted until some time afterward.
At the penalty phase of the trial, defense counsel made it clear in his opening statement that the central issue of the case had never been whether defendant was guilty of the crimes of which he had been convicted, but was rather the degree of culpability attaching to defendant's acts. Defense counsel argued that because of defendant's mental retardation and other mental defects, defendant was one of a class of people who should be spared the death penalty. In its case in chief, the state called only two witnesses, the coroner and an investigating police officer, both of whom were present at the initial examination of the victims' bodies and testified as to the condition of the bodies and the crime scene. Defense counsel, in addition to calling a number of defendant's family members, called Dr. Rhea, a psychologist, to testify as to defendant's mental state. Dr. Rhea felt that, in addition to mental retardation, defendant suffered from episodic explosive disorder and that defendant could not distinguish between right and wrong during his explosive episodes.
After the defense had rested its case, the state called Dr. Strickland for the first time in rebuttal to refute Dr. Rhea's testimony. Defense counsel objected to the use of Dr. Strickland's testimony on the ground that the state had sent Strickland to see defendant without his knowledge or consent. However, the trial judge overruled the objection. Based on his interview with defendant, and on his review of other medical *98 records, Dr. Strickland testified that Dr. Rhea's diagnosis of episodic explosive disorder was a "tentative" one, inconsistent with prior diagnoses of a conduct disorder, and inconsistent with defendant's apparent intact memory. In Dr. Strickland's view, defendant suffered only from mild mental retardation.
In Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Supreme Court was confronted with an analogous situation. In that case, the trial court, on its own initiative and without a request from counsel, informally ordered the state's attorney to arrange a psychiatric examination of the defendant, Smith, by one Dr. James P. Grigson to determine defendant's competency to stand trial. Defense counsel was allegedly not notified that Dr. Grigson was to examine the defendant. Dr. Grigson, who interviewed Smith in jail for approximately 90 minutes, concluded that he was competent to stand trial. In a letter to the trial judge, Dr. Grigson reported his findings: "[I]t is my opinion that Ernest Benjamin Smith, Jr., is aware of the difference between right and wrong and is able to aid an attorney in his defense." This letter was filed in the record of the case. Smith was then tried by a jury and convicted of murder.
After the defendant was convicted of murder, a sentencing hearing was conducted, at which Dr. Grigson testified for the state. Based upon his interview with the defendant, Grigson testified as to the future dangerousness of the defendant, one of the three criteria under state law which, if all proven beyond a reasonable doubt, require the imposition of the death penalty.
The Court held that Smith's fifth and sixth amendment rights had been abridged by the state's introduction of Dr. Grigson's testimony at the penalty phase and thus affirmed the judgment of the federal court of appeals vacating Smith's death sentence. Estelle v. Smith, supra, at 473, 101 S.Ct. at 1878. According to the Court, Smith's fifth amendment privilege was "directly involved... because the state used as evidence against Smith the substance of his disclosures during the pretrial psychiatric examination." Id. at 464-65, 101 S.Ct. at 1874. Smith's sixth amendment right to the assistance of counsel was held to have been violated because "[d]efense counsel... were not notified in advance that the psychiatric examination would encompass the issue of their client's future dangerousness [footnote omitted], and [Smith] was denied the assistance of counsel in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." Id. at 470-71, 101 S.Ct. at 1877.[10]
In the instant case, defense counsel was not notified that the state was going to have defendant examined, although defendant's sixth amendment rights clearly had attached at the time of Dr. Strickland's examination on February 7, 1986.[11] Because Dr. Strickland later testified at the penalty hearing in rebuttal of defense evidence tending to show mental disease or defect, a statutory mitigating circumstance,[12] Dr. Strickland's examination of defendant, like Dr. Grigson's examination of the defendant in Estelle v. Smith, "proved to be a `critical stage' of the aggregate proceedings against respondent." Estelle v. Smith, supra, at 470, 101 S.Ct. at 1877. This was especially true *99 since Dr. Strickland was called for the first time in rebuttal. Thus, by the state's failure to give defense counsel notice of its intent to examine defendant, defendant was effectively deprived of his sixth amendment right to the assistance of counsel in dealing with the examination of Dr. Strickland.[13] Accordingly, because of the use of Dr. Strickland's testimony during the penalty phase of defendant's trial,[14] which testimony was based upon an examination conducted in violation of defendant's sixth amendment rights,[15] we conclude that defendant's sentences must be vacated, and a new penalty hearing conducted.

DECREE
For the reasons assigned, defendant's convictions are affirmed. However, defendant's sentences are vacated, and the case is remanded to the district court for a new penalty hearing in accordance with the views expressed herein.
DIXON, C.J., dissents as to the guilt phase.
NOTES
[1] La.Code Crim.P. art. 798(2) provides:

It is good cause for challenge on the part of the state, but not on the part of the defendant that:
. . . .
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt; ....
[2] La.R.S. 15:451 provides:

Before what purposes [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.
[3] We note that the United States Supreme Court has recently rejected the notion that an accused's mental state can, by itself, vitiate his attempted waiver of the right to counsel and the privilege against self-incrimination, thus tainting any subsequent confessions. In Colorado v. Connelly, ___ U.S. ___, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the defendant waived his constitutional rights and made a confession because of a psychosis which caused him to believe that the "voice of God" was demanding that he confess. The Court held that coercive police activity was a necessary predicate to the finding that a confession was not voluntary within the meaning of the due process clause of the fourteenth amendment.
[4] The substance of this testimony is set forth in our treatment of Assignment of Error No. 5.
[5] La.Code Crim.P. art. 797 provides in pertinent part:

The state or the defendant may challenge a juror for cause on the ground that:
. . . .
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence.
. . . .
(4) The juror will not accept the law as given to him by the court....
[6] La.Code Crim.P. art. 798(2) provides:

It is good cause for challenge on the part of the state, but not on the part of the defendant that:
. . . .
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt; ....
[7] As in Assignment of Error No. 2, we pretermit discussion of the effect of Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), since we find that the trial judge's excusing of Gistarb and Noel for cause was not erroneous under the more stringent standard of La.Code Crim.P. art. 798(2) and Witherspoon.
[8] La.Code Crim.P. art. 797(2) provides:

The state or the defendant may challenge a juror for cause on the ground that:
. . . .
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence.
[9] La.Code Crim.P. art. 761 provides:

A jury trial commences when the first prospective juror is called for examination. A trial by a judge alone commences when the first witness is sworn.
[10] In Buchanan v. Kentucky, ___ U.S. ___, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the Supreme Court found that the prosecution's use of a psychiatric report to rebut the defendant's psychological evidence did not violate his fifth and sixth amendment rights under Estelle v. Smith. However, in Buchanan, defendant's counsel himself requested the psychiatric evaluation by the doctor; hence, the Court found no sixth amendment violation.
[11] The grand jury returned an indictment against defendant on September 26, 1985.
[12] La.Code Crim.P. art. 905.5 provides in relevant part:

The following shall be considered mitigating circumstances:
(e) At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication.
[13] Had defense counsel been timely apprised of the examination, he could have possibly blocked the examination altogether or at least sought to limit the use of the examination at trial. See Estelle v. Smith, 451 U.S. at 472, 101 S.Ct. at 1878.
[14] We note that as discussed in Assignments of Error Nos. 5, 6, 13, and 14, Dr. Strickland also testified at the hearing on defendant's motion to determine capacity to proceed and his motion to suppress certain inculpatory statements. However, because the evidence was sufficient to support the trial court's ruling on both motions even without the tainted testimony of Dr. Strickland, the admission of his testimony into evidence at that hearing was harmless error. See La.Code Crim.P. art. 921. Moreover, in Estelle v. Smith, 451 U.S. at 465, 101 S.Ct. at 1874, the Supreme Court stated in dicta that an ex parte examination of a defendant for the "limited, neutral purpose of determining his competency to stand trial" would not violate that defendant's fifth amendment rights. The Court further suggested that where a defendant puts his mental condition at issue, as with a plea of insanity (or in this case, defendant's assertion that his mental condition precluded a valid waiver of his rights before making his inculpatory statements), a defendant may be required to submit to a psychiatric examination conducted by the prosecution's psychiatrist. Id.
[15] Defendant neither raises nor argues in brief any claim based upon the fifth amendment issue raised in Estelle v. Smith. Hence, because this issue is unnecessary to our disposition of this assignment of error, we pretermit discussion of this issue.