664 So.2d 1291 (1995)
STATE of Louisiana
v.
Edward BADON.
No. 95-KA-0452.
Court of Appeal of Louisiana, Fourth Circuit.
November 16, 1995.
*1292 Harry Connick, District Attorney, Parish of Orleans, Kim Madere Graham, Assistant District Attorney, New Orleans, for State.
Archie B. Creech, Orleans Indigent Defender Program, New Orleans, for Edward Badon.
Before BYRNES, PLOTKIN and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE:
Edward A. Badon was charged by Grand Jury bill of indictment with the second degree murder of his grandmother, a violation of La.R.S. 14:30.1. At his arraignment, he pleaded not guilty, but subsequently amended his plea to not guilty by reason of insanity. Following a lunacy hearing, Badon was *1293 found competent to proceed to trial. The trial court denied Badon's Motion to Suppress Evidence. On defense motion, a second sanity commission was appointed, and again Badon was found to be competent. After trial, a twelve-member jury found him guilty as charged, and he was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence.

STATEMENT OF THE FACTS:
HEARING ON MOTION TO SUPPRESS EVIDENCE
Officer Byron Adams of the New Orleans Police Department's Homicide Investigations Division testified at the motion hearing. He testified that during his investigation of the death of Gollia McGee, Badon made several statements. In the first, Badon told Adams that at 9:30 a.m., he and Mrs. McGee (Badon's grandmother) were sleeping. Badon answered a knock on the door, and, upon opening the door, saw two black males in Sewerage and Water Board uniforms. One of the men grabbed Badon around the neck, dragged him to the back room, cut him, punched him in the jaw and rendered him unconscious. Badon awoke to the ringing telephone, kicked it off the hook and asked whoever was on the phone to call the police because he and his grandmother had been stabbed. In response to Badon's initial statement, Adams and other NOPD officers conducted a thorough scene investigation, lasting approximately 45 minutes to one hour which revealed that Badon's story was untrue. The doors were locked from the inside with a deadbolt, and there was very little blood in the room wherein Badon claimed he was stabbed and beaten. The scene investigation was the normal procedure implemented at every crime scene in every house wherein a dead body is found. Adams then approached Badon, advised him he was under arrest for first degree murder and advised him of his Miranda rights. The officers photographed Badon's injuries and had him transported to Charity Hospital for treatment.
After having been brought to the Homicide Division from the hospital, after treatment, Badon was advised of his rights by NOPD form and said he wished to give a formal statement. During the interview prior to the formal statement, Badon said a drug dealer to whom he owed a great deal of money sent people to Badon's apartment to collect the debt. Because Badon did not have the money owed, the collection agents beat and cut him and killed his grandmother as an example. Adams questioned Badon about details of his story, and Badon offered a third version, that he brought a man named Charles to his house, where they smoked crack cocaine, became intoxicated, and Charles killed Badon's grandmother, took the hammer and knife used in the murder, wrapped them in a bag and threw them into a sewer drain. Badon and Adams went to the drain and found the evidence. Badon told Adams he did not think Adams believed his story, and admitted that he had killed his grandmother.
The keys to the residence were missing, and Badon told Adams they were hidden under the dresser. Badon asked to speak to his mother prior to making a formal statement. Adams' partner went to retrieve the keys and told Badon's mother Badon wanted to speak to her. Badon met with his mother at the Homicide Division. She told the officers that she asked Badon if the police had beaten him, that he denied that the police had done so, and that Badon was willing to give the NOPD a formal statement, and left.
During his interview, Badon told the officers that he had been drinking, wanted some crack, and asked his grandmother for the use of her car. When she refused, he went to the kitchen, picked up a hammer and knife, returned to his grandmother's bedroom and stabbed and beat her. He then went to the bathroom, cut himself with a box cutter (subsequently recovered by NOPD) and a knife so that he would appear to have been injured by the phantom strangers who had broken into the house. He then left in the car, dropped the evidence in the storm drain, returned to the house, locked up everything and hid the keys under the dresser. When his brother called later in the morning, Badon told him someone had broken into the *1294 house and stabbed him and his grandmother, and that the telephone was not allowing him to place outgoing calls.
At the beginning of the taking of Badon's formal statement, Badon revealed that he could neither read nor write, and refused to give an audio or video recorded statement.
Adams testified that he seized the following evidence: the victim's bedding, a box cutter, samples of blood, tennis shoes, blood stained clothing from Badon's room, a kitchen knife from the sink, a machete from next to the victim's bed, all from the victim's residence; a bag containing a hammer and butcher's knife seized from the sewer drain; and keys seized as a result of Badon's statements, from beneath the dresser in Badon's room. Adams testified that the keys were obtained with the consent of the victim's daughter-in-law, and the remaining items seized in the victim's residence were obtained after entry in response to Badon's distress call, and with Badon's mother's permission.
The trial court denied Badon's motion to suppress the evidence, finding that the police had a right to be present at the crime scene, and were under no obligation to leave the scene to obtain a search warrant when they began to suspect that Badon was his grandmother's murderer.

TRIAL TESTIMONY
Officer Edmond Henry testified that on 26 November 1994 he and his partner, Lionel Wettles, investigated a reported aggravated burglary. They knocked on the door of 2135 Jourdan Avenue but got no response. An inspection of the house proved that every entrance was locked. They called ranking officers to the scene who gave them permission to break the door down. They heard moaning sounds at the end of the hallway, entered a bedroom and found Badon on the floor moaning and complaining of being hurt. In the next bedroom, the officers found the motionless body of Gollia McGee, and called an Emergency Medical Services unit. The E.M.S. personnel pronounced McGee dead on the scene. Henry identified photographs of Badon, showing lacerations to his left side, and photographs accurately representing the scene in the victim's bedroom. Badon told the officers that at about 1 a.m. he heard knocking on the kitchen door, and when he answered, two men in Sewerage and Water Board uniforms entered the house and beat him until he was unconscious. Henry testified that Badon did not appear to have been beaten unconscious nor did he have any injuries consistent with having suffered such a beating. Henry testified that the investigators then notified the Crime Lab and Homicide detectives of their findings, and when the latter arrived at the scene, they gathered pertinent evidence.
Mr. Cornell Porter testified that he was going into his home at 2207 Jourdan Avenue at about midnight on 26 November 1993, when he heard a noise. He looked toward Badon's home and saw a black man leaving the house, getting into car, and driving away.
Detective Byron Adams testified to the facts set out in his testimony at the hearing on the defense motion to suppress evidence. In the kitchen the detective found a knife with a six inch blade in the sink and a box cutter on the counter. There was no sign of a struggle in the house. In Badon's bedroom were two or three spots of blood and a blue-jean jacket that appeared to be bloodstained. In Mrs. McGee's room the detective saw splatters of blood on the ceiling and on one of the walls; a machete was found near the bed. Adams testified to the various versions of the incident given by Badon, to having given Badon the Miranda warnings, and to the discovery of the hammer and knife that had been wrapped and thrown into a storm drain.
Adams identified photographs of the kitchen sink and cabinet, the knife recovered from the sink and the box cutter that had been found in the kitchen cabinet. Both the knife and cutter appeared to have blood residue. He identified a photograph of the face bowl in the bathroom and blood stains and smears in the bowl and on the front of the bathroom cabinet. He identified a photograph of a waste basket, adjacent to the bowl, that contained *1295 blood stained tissue or paper. He identified a jacket recovered from the residence that he believed may have had blood on its sleeves and front, and a photograph of the jacket when it lay on Badon's bed. He likewise identified tennis shoes found at the scene that appeared to be blood-stained. Adams then identified photographs of the victim's bedroom showing blood stains on the ceiling and walls, and a machete standing in the corner between the night table and the bed on the same side as the victim's body, next to her head.
According to the detective, after he advised Badon of his rights as an arrestee, Badon informed Adams that he had lied when at the crime scene. Mr. Badon then related the following:
[Badon] had started drinking Cisco and was talking to his girlfriend on the telephone. Upon completion of the telephone conversation, he had the sudden urge for crack cocaine. He stated that he just clicked and he went in the room and he asked his grandmother to lend him the vehicle. That's when he said upon her refusal, he then clicked. And he went into the kitchen and got a knife and a hammer, went back into the bedroom and then beat the victim about the head and face with the hammer, then continuously stabbed her. He stated that after that, he then went in the room and realized what he had done, at which time he then orchestrated the cover-up and all and had the police notified by his brother who had called him.
Dr. William P. Newman, III, professor of pathology at the Louisiana State University School of Medicine and consultant to the Orleans Parish Coroner's Office, who performed the autopsy on the sixty-three year old victim, testified that he found twenty-five incised wounds, three or four of which would have been fatal, and two blunt trauma wounds. She had a skull fracture and a fracture of the jaw, and both her lungs and her heart were perforated. He identified his autopsy report and chart of the victim's injuries. Dr. Newman found no wounds consistent with a struggle.
Mrs. Orrazine Badon, Badon's mother and the victim's daughter, testified that her son told her he had killed her mother. Mrs. Badon said Edward Badon lived with her mother for the past ten years helping her by doing household work. In the month before her death, Mrs. McGee had eye surgery; when she came home, Edward did everything for her. Mrs. Badon acknowledged that Edward had a drug problem. She said the morning after the murder when she saw Edward, he did not recognize her.

ERRORS PATENT
A review of the record for errors patent reveals none.

FIRST ASSIGNMENT OF ERROR: The trial court erred in allowing a bloodstained blue-jean jacket and a machete into evidence over defense objection.
Badon contends the items are not relevant because there was no proof offered at trial that the spots on the jacket were actually blood and there was no evidence that the machete was used in the crime. The items are objectionable, he argues, for their prejudicial value. Although neither was linked to the crime, the State created a "fictional link" between these items and the crime by introducing them into evidence according to the appellant.
Relevant evidence is defined by La. C.E. art. 401 as:
evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
The standard of relevancy is based upon logic and experience. So long as the proffered evidence has a tendency to make a consequential fact more or less probable, the logical relevancy test is satisfied. Logically relevant circumstantial evidence should be excluded only if its probative value is outweighed by the risk that its admission will consume too much time, unnecessarily confuse the jury concerning the issues to be *1296 determined, tend to excite emotions of the jury to the undue prejudice of the opponent, or unfairly surprise the opponent. State v. Davenport, 445 So.2d 1190, 1195 (La.1984). We do not find these exclusionary factors to be present in the instant case.
Absent a clear abuse of discretion, the trial court's ruling as to relevancy should not be disturbed on appeal. State v. Whittaker, 463 So.2d 1270, 1272 (La.1985).
The blood stains on Badon's jacket were not shown to be his blood or the victim's blood. Because the State has not clearly connected the jacket to the crime or the attempted cover-up, its admission into evidence was error. We find that the defendant was not prejudiced by admission of the evidence. The trial court's error was harmless.
The machete found in a corner of the grandmother's bedroom near the head of her bed is also evidence of Badon's attempted cover-up. It corroborates Adams' testimony that Badon first declared that two men in Sewerage and Water Board uniforms burst into the house and committed the murder and his later story that a drug dealer killed her. The machete was evidence that Badon attempted to cover up his crime by planting the machete, which was not the murder weapon, in order to distract the investigation from its proper object.
The trial court did not err in finding that the jacket and machete were relevant. There is no showing that their admission prejudiced the defendant. Moreover, the fact that more than sufficient evidence existed to prove Badon killed the victim while possessing either the intent to kill or to inflict great bodily harm supports a finding that the admission of this evidence did not lead to the appellant's being convicted. The trial judge did not err in allowing the evidence to be admitted. The court's decision was within its discretion. This assignment of error is without merit.
SECOND ASSIGNMENT OF ERROR: The trial court erred in allowing the introduction of gruesome photographs over defense objection.
In State v. Eaton, 524 So.2d 1194, 1201 (La.1988), cert. denied, Eaton v. Louisiana, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989), our Supreme Court set the standard for review of introduction of gruesome photographs:
This court has established a number of well settled guidelines regarding the introduction of photographs. The mere fact a photograph is gruesome does not in and of itself render a photograph inadmissible. The test of admissibility is whether the probative value outweighs any prejudicial effect which may result from the display to the jury. State v. Comeaux, 514 So.2d 84 (La.1987); State v. Beach, 320 So.2d 142 (La.1975); State v. Morris, 245 La. 175, 157 So.2d 728 (1963). Generally, photographs of a victim's body which depict the fatal wounds are relevant to prove the corpus delicti, to establish the identity of the victim, the location, severity and number of wounds, and to corroborate other evidence of the manner in which the death occurred. Comeaux, 514 So.2d at 96. The trial court's admission of an allegedly gruesome photograph will be overturned on appeal only if the prejudicial effect clearly outweighs the probative value. No error will be found unless the photographs are so gruesome so as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence." State v. Perry, 502 So.2d 543 (La.1986).
In the instant case, the trial court reviewed the photographs as they were admitted into evidence. The photographs serve to verify and corroborate Detective Adam's testimony and the other evidence produced as a result of the police investigation. We have reviewed the photographs. They certainly are not pleasant. The stabbing and bludgeoning murder of a sixty-three year old grandmother is not pleasant. However, the photographs depict the actual circumstance of the crime and its aftermath and they are not so gruesome as to "overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence." There is no merit to this assignment of error.

CONCLUSION
Our complete review of the record reveals no errors patent, and the appellant's assignments *1297 of error are without merit. The appellant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
PLOTKIN, J., concurs.
PLOTKIN, Judge, concurring.
A foundation was not laid to establish that it was more probable than not that the jacket and machete were connected to the crime. Cf. State v. Sam, 412 So.2d 1082, 1086 (La. 1982). Therefore, the trial judge's ruling that the jacket and machete were relevant was incorrect and a clear abuse of discretion. I concur, however, because the error was harmless. The evidence against the appellant is overwhelming and the prejudicial value of those items is slight.