11 KIRBY, Judge.
On September 16, 1996, the appellant was charged with one count of being in possession of stolen property valued at least $500 and one count of attempted simple robbery. At his arraignment on October 10th he pled not guilty to both charges. On January 16, 1997, a six-person jury found him guilty as charged as to the stolen property count and not guilty of the robbery count. The State charged him as a multiple offender, and after a hearing on February 14th, the court found him to be a second offender. The court ordered a presentence investigation and reset sentencing. On May 23rd, the court sentenced the appellant to serve twelve years at hard labor as a second offender. The court denied the motion to reconsider sentence but granted the .motion for appeal.
On the evening of June 27, 1996, Officer Mike Montalbano was working a paid detail for a neighborhood watch organization in the Carrollton area. At approximately 9:00 p.m., he observed a red Chevy Blazer run a stop sign at the corner of Short Street and S. Claiborne Avenue. He followed the Blazer, which turned from Claiborne onto Carrollton Avenue, and he activated his lights and siren in order to stop the Blazer to give the driver a traffic citation. Instead, the Blazer kept going, eventually pulling into the parking lot of a Walgreen’s store at | ¡¿he corner of Carroll-ton and Earhart Boulevard. At the back end of the parking lot the driver, the defendant Darren Harper, stopped and exit- ’ ed the Blazer. Harper began walking toward Off. Montalbano, cursing ■ him and keeping his hands in his pockets. The officer ordered Harper to take his hands out of his pockets, and when Harper refused to do so, the officer drew his gun and ordered Harper to kneel on the ground with his hands in the air. Off. Montalbano testified that Harper at first obeyed, but when he asked Harper for his driver’s license, Harper indicated he did not have one. The officer then grabbed Harper’s arm to handcuff him and place him under arrest for driving without, a license. At that point, Harper began struggling with the officer.
Off. Christopher Landry, an Orleans Parish Levee Board officer, was working a paid detail at the Walgreen’s and had been monitoring the police radio. He heard a partial broadcast concerning the parking lot, and he went to the window and saw a police car parked at the back of the lot behind a Chevy Blazer. Off. Landry walked outside and saw Harper on his knees on the ground struggling with Off. Montalbano, who was trying to handcuff Harper. Off. Landry testified he saw Harper push Off. Montalbano down, and Landry grabbed Harper to try to restrain him. Off. Landry and Harper fell to the ground and continued struggling. Off. Montalbano testified that during this struggle, Harper reached for Montalbano’s gun, actually placing his hand on the gun. Harper broke free and ran down Earhart toward Burdette Street.
Off. Louis Gaydosh testified he was working a detail at a nearby baseball field, patrolling the area, when he heard the broadcast of Off. Montalbano’s pursuit of the Chevy Blazer into the Walgreen’s parking lot. He testified he drove to the corner of Earhart and Carrollton and *288 parked, watching the scene. He testified he lsthen heard Off. Montalbano’s call of a suspect escaping on foot, and he looked across the street and saw a man running down Earhart toward Burdette. He testified he drove to Burdette and blocked the man’s escape. The man, who he identified as Harper, then stopped and ran back toward Off. Montalbano, who captured him.
Off. Montalbano took Harper, still struggling, back to the parking lot. He testified Harper kept threatening to file a complaint against him, stating that he (Harper) was a police informant and that he would get any charges dropped. The officer then looked at the Blazer and noticed the door lock had been damaged. He looked inside the Blazer and discovered the steering column had been defeated, although he admitted that a person in the passenger seat may not have been able to see the damage to the column. He could see no keys in the Blazer. He opened the glove compartment and found the registration for the Blazer, which indicated it belonged to Linda Bordelon. He also saw inside the car a machete, a screwdriver, and a book bag. The police contacted Ms. Bordelon, who came to the scene and identified the Blazer as belonging to her. She also indicated the Blazer had been stolen that morning, and she had not given Harper permission to drive the Blazer. Because Ms. Bordelon’s keys did not work in the ignition, Off. Montalbano used the screwdriver to start the Blazer so that she could drive it home.
Linda Bordelon testified her daughter had driven the Blazer to U.N.O. on the morning of June 27th, and it had been stolen sometime between 9:00 a.m. and noon. She testified the machete, the book bag, and several beer cans found in the Blazer did not belong to her family. She also testified she had purchased the truck in November, 1995 for $10,000, and it was in working order when it was stolen. She testified the repair bill for the damages to the Blazer was $900.
LDarren Harper denied knowing the Blazer was stolen. He insisted he had met a friend in another part of the city who was using the Blazer and who offered Harper a ride. He testified that the two men decided to get some food, but the other man asked Harper to go get it. Harper testified he then slid over to the driver’s side and drove the Blazer. He insisted he did not see the defeated column and that keys were in the ignition when he was driving it. He maintained he threw the keys on the floorboard when he exited the car. He testified he drove down Claiborne to Carrollton and then turned up Carroll-ton, and he did not see Off. Montalbano’s car until he was at the Walgreen’s parking lot. He insisted he entered the parking lot, stopped the Blazer, and exited, walking toward Off. Montalbano with his hands in the air. He testified Off. Montalbano ordered him to get on the ground, and the officer hit him on the backs of his legs with a nightstick, causing him to fall. He testified that when the officer twisted his arm roughly up behind his back, he broke free and began running. He stated he did not get a chance to tell the officers about his friend having the Blazer prior to his obtaining it. He admitted he had worked at a mechanic’s shop in the past, and he could recognize a defeated steering column and knew how to start a car with a screwdriver. He also admitted having a prior conviction for possession of a stolen truck and for possession of stolen fish valued over $4000.
By his first assignment of error, the appellant contends the trial court erred by admitting into evidence the machete found inside the stolen Blazer. He contends the machete was not relevant to the charge against him, and its very nature was prejudicial to his case.
La. C.E. art. 401 defines “relevant evidence” as “evidence having any tendency to make the existence of any fact that is of consequence to the | ¡^determination of the action more probable or less probable than it would be without the evidence.” As per *289 art. 402, “[e]vidence which is not relevant is not admissible.” In State v. Badon, 95-0452, pp. 7-8 (La.App. 4th Cir.11/16/95), 664 So.2d 1291, 1295-1296, this court stated:
The standard of relevancy is based upon logic and experience. So long as the proffered evidence has a tendency to make a consequential fact more or less probable, the logical relevancy test is satisfied. Logically relevant circumstantial evidence should be excluded only if its probative value is outweighed by the risk that its admission will consume too much time, unnecessarily confuse the jury concerning the issues to be determined, tend to excite emotions of the jury to the undue prejudice of the opponent, or unfairly surprise the opponent. State v. Davenport, 445 So.2d 1190, 1195 (La.1984).... Absent a clear abuse of discretion, the trial court’s ruling as to relevancy should not be disturbed on appeal. State v. Whittaker, 463 So.2d 1270, 1272 (La.1985).
Here, the officer found the machete inside the Blazer when he entered the Blazer to get its registration. The owner of the Blazer testified the machete did not belong to any of her family, nor did the screwdriver, the black book bag, and the empty beer cans found in the Blazer when the officer recovered it. As such, it could be argued that the presence of these items in the Blazer corroborated the owner’s testimony that the Blazer had been stolen, negating any inference that the appellant had permission to be in possession of the Blazer.
The appellant correctly asserts that there was no evidence to tie him to the machete, other than its presence in the Blazer when he was arrested, a point which would not have been lost on the jury. Thus, any prejudicial effect from the machete’s presence in the Blazer would be minimal, at most. In addition, prior to the State’s formal offer of the machete into evidence at the end of the presentation of its cases, three witnesses testified to the existence of the machete in the Blazer, Land two witnesses identified the machete in court. In none of those cases did counsel object to this testimony or these identifications. Thus, even if the trial court’s decision to allow the State formally to introduce the machete into evidence can be seen to be error, this error would have been cumulative at most to other evidence introduced without objection. As such, any error would not have contributed to the verdict and thus would be harmless. See La.C.Cr.P. art. 921; Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Harris, 97-0300 (La.4/14/98), 711 So.2d 266; State v. Corley, 93-1934 (La.3/11/94), 633 So.2d 151 [1]. This assignment has no merit.
By his second assignment of error, the appellant contends the trial court imposed an excessive sentence. The court sentenced him to serve twelve years at hard labor. The range of sentences he could have received as a second offender was five (half the maximum sentence) to twenty (twice the maximum) years. See La. R.S. 14:67; La. R.S. 15:529.1. He argues that the imposition of twelve years was abuse of the trial court’s discretion given the nature of his crime.
In State v. Riley, 98-1323, pp. 7-8 (La. App. 4 Cir.8/4/99), 744 So.2d 664, 668, this court set forth the standard for evaluating an excessive sentence claim:
Article 1, Section 20 of the Louisiana Constitution of 1974 provides that “No law shall subject any person ... to cruel, excessive or unusual punishment.”
. A sentence within the statutory limit is constitutionally excessive if it is “grossly out of proportion to the severity of the crime” or is “nothing more than the purposeless imposition of pain and suffering.” State v. Caston, 477 *290 So.2d 868 (La.App. 4th Cir.1985). Generally, a reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Soco, 441 So.2d 719 (La.1983); State v. Quebedeaux, 424 So.2d 1009 (La.1982).
If adequate compliance with Article 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Quebedeaux, supra; State v. Guajardo, 428 So.2d 468 (La.1983).
Here, the appellant argues the trial court improperly based his twelve-year sentence on the fact that he used obscenities to the police officers during his apprehension. A review of the sentencing transcript indicates the trial court did refer to this use of obscenities. However, it is apparent that the trial court also based its sentence on the appellant’s prior convictions for various crimes, plus the fact that the appellant’s statement in the presen-tence investigation report indicated he knew the Blazer was stolen, but he was not the person who stole it. The court noted the only identification on the appellant at the time of his arrest was a state prison identification card. After noting the appellant had no juvenile record, the court then listed the appellant’s criminal record, which included a 1982 conviction for felony theft, a 1988 conviction for possession of a stolen automobile, a 1990 conviction for resisting arrest, a 1994 acquittal on a charge of possession of a stolen automobile, a 1994 conviction for false impersonation of a police officer, a 1994 conviction for possession of a stolen automobile, and three convictions for battery of a police officer. (5/23/97 sent. tr. pp. 5-6) The court then stated:
|sThe Court is concerned that this gentleman appears to have a proclivity to be in possession of vehicles that obviously do not belong to him, that have indeed been stolen. The Court further is concerned that although, and I suspect [defense counsel’s] comments in his appeal to the Court for some consideration for the gentleman, that although the crimes might not be viewed as serious violence, there is at least one incident where this gentleman has been found guilty of battery on police officers as well as the language that this gentleman, and I don’t want to — I want to - I cannot over emphasize the use of this language, the lack of respect for the officers. This causes this Court great, great, great, great concern. It shows me a lack of any type of decorum, any desire to want to live in this community and abide by the rules, even the most basic rules of politeness to those authority figures who serve us on a daily basis and who, in my opinion, have used great restraint in this matter.
[[Image here]]
This Court finds that this gentleman has been given several opportunities at probation. He’s been given several opportunities at minimal sentences.... But in certain cases where a defendant that shows no remorse, shows no desire to want to cooperate with the - the authorities, does not submit himself to a peaceful arrest, does what he does with the police, including the high speed chase of the streets of the city, endangering the lives of the officers, himself, the property of the person he was in possession of, as well as other citizens on the streets in a very busy neighborhood.
(5/23/97 sent. tr. pp. 6-7) The court then imposed the twelve-year sentence.
The transcript shows more than adequate compliance with La.C.Cr.P. art. *291 894.1 and shows a basis for the sentence beyond the appellant’s use of profanity to the officers. This particular claim has no merit.
A comparison with similar cases reveals the twelve-year sentence is not excessive in this case. In Riley, supra, the defendant led police officers on a high-speed chase in a stolen automobile, and when he wrecked the automobile, he fled on foot until he was apprehended. He had many prior convictions and was on 19probation at the time of the offense. This court rejected his claim that his eighteen-year sentence was excessive. In State v. Smith, 450 So.2d 679 (La.App. 4 Cir.1984), this court upheld a twenty-year sentence on a third offender convicted of a violation of La. R.S. 14:69 where he had been convicted of three felonies in five years. In State v. Bell, 544 So.2d 32 (La.App. 4 Cir.1989), this court upheld a maximum sentence of ten years for a conviction of La. R.S. 14:69 on a first offender who had an extensive juvenile record and who was in possession of goods stolen from the scene of a murder.
Here, as in Riley, the appellant led officers on a car and foot chase, and as in Riley and Smith, the appellant here had an extensive criminal record. Based upon these factors, the trial court was justified in imposing the twelve-year sentence in this case. This assignment of error has no merit.
For the above stated reasons, we affirm the conviction and sentence.
AFFIRMED.

. Cert. denied 513 U.S. 930, 115 S.Ct. 322 (1994).