NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-1283

STATE OF LOUISIANA

VERSUS

JARVIS JERMAINE SHELVIN

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 110,925
HONORABLE PATRICK MICHOT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

OSWALD A. DECUIR
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Oswald A. Decuir, James T. Genovese, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

Michael Harson
District Attorney
Keith A. Stutes
Assistant District Attorney
P.O. Box 3306
Lafayette, LA 70502-3306
(337) 232-5170
Counsel for Appellee:
    State of Louisiana

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602**
**(337) 491-0570**
**Counsel for Defendant/Appellant:**
    **Jarvis Jermaine Shelvin**

**DECUIR, Judge.**

Following a jury trial, Defendant, Jarvis Jermaine Shelvin, was convicted on one count of second degree murder and sentenced to life imprisonment. Defendant lodged this appeal, alleging that the evidence was not sufficient to support his conviction and that the trial court erred in denying his request to exclude crime scene photographs.

**FACTS**

On the evening of April 26, 2006, Defendant shot and killed the victim during a robbery.

**SUFFICIENCY OF THE EVIDENCE**

By this assignment of error, Defendant argues that there was insufficient evidence for a jury to find him guilty beyond a reasonable doubt. The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Second degree murder is defined in La.R.S. 14:30.1(A), in pertinent part, as follows:

> A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.

In the instant case, Defendant challenges only his identity as the perpetrator. Defendant complains that the jury incorrectly relied on the self-serving testimony of Jamaesha Provost, a participant in the offense, and the testimony of Shayla Prejean, a sixteen-year-old eyewitness, in finding him guilty. Defendant adds that no weapon or money was ever recovered from him.

At trial, Jamaesha Provost testified that Defendant killed the victim. She described a plot to rob the victim that did not turn out as originally planned. Jamaesha stated that she had known the victim for about a week, and he would stop to speak with her if he saw her outside her residence. The victim nicknamed her "Black." On the day of the offense, the victim stopped to speak to Jamaesha. At that time, Defendant, Norris Landor, and Georgia Norbert were also at Jamaesha's house. Norris was dating Jamaesha at the time. During the victim's conversation with Jamaesha, he pulled out a large roll of cash and gave her thirty dollars. According to Jamaesha, Defendant saw the roll of cash and subsequently devised a scheme to rob the victim.

Jamaesha was to walk to the victim's home and persuade the victim to go on a walk with her. Defendant would then knock the victim out and take his money. Jamaesha agreed with the plan. Later that evening, Jamaesha, Defendant, and Norris met back at Jamaesha's house, and the plan to rob the victim was put into action.

Jamaesha walked by the victim's house where he was outside with two other people. According to Jamaesha, she asked the victim to walk with her to the store. The victim, however, asked a guy on a bike to go to the store for Jamaesha, and then he escorted Jamaesha to her home. Jamaesha testified that the victim wanted to walk to the nearby park, so they proceeded to the park and sat down on a park bench. Later, the man on the bike returned with the items he purchased at the store and then rode away.

Soon thereafter, Defendant approached Jamaesha and the victim as planned, and then began yelling "get down." Jamaesha stated that Defendant was dressed in all black, and she recognized him from his size, the way he talked, and his voice. Jamaesha saw that Defendant had a gun, and she took off running. Jamaesha maintained that the gun was not part of the plan. While fleeing from the park, Jamaesha heard a gunshot. She ran to her house and told Norris that she heard a gunshot and that Defendant had shot the victim. Jamaesha testified she knew without a doubt that Defendant shot the victim. Lastly, Jamaesha stated that she was no longer dating Norris and maintained that she was not protecting Norris by implicating Defendant.

Georgia Norbert confirmed that there was talk of robbing the victim on the day of the offense. According to Georgia, Jamaesha was talking to the victim outside. When she came back inside, Jamaesha reported that the victim had a lot of money on him. Georgia testified that she believed Norris, Jamaesha's boyfriend, said they ought to beat the victim at that time and take his money. She indicated that Defendant was also present. Georgia testified that both she and Jamaesha discouraged the suggestion to rob the victim at that time, and Georgia left Jamaesha's

3

house and did not return that evening. The following afternoon, Georgia learned that the victim had been killed.

Phillip Gotch, a friend of the victim, confirmed that Jamaesha approached the victim's house prior to the shooting and asked for him. Phillip and another man, C.J., were at the victim's home. According to Phillip, the victim came out of his home, talked with Jamaesha for two to three minutes, and then started walking with Jamaesha. About ten to fifteen minutes later, a man called "Money" rode up on his bike and told Phillip that he had gone to the store and that the victim was by the park with Jamaesha. Soon thereafter, Phillip heard a gunshot from across the park. Phillip was not surprised by the gunshot and did not pay much attention to it at first.

Phillip then saw Money run to his bike and take off. Phillip decided to follow him along with C.J. As they headed toward the park, Phillip saw a short, chubby man wearing a gray sweatshirt and pants running from the park. Phillip could not see the man's face, but noticed that he was holding something in his back pocket. Also, the person he saw running was not Jamaesha. Later, Phillip added that the man's clothing was very dark.

Milton Marshall, a/k/a Money, testified that he was with the victim all day and that he last saw the victim at the park about five to ten minutes before he was shot. He explained that the victim was with a short, stocky female wearing a black hood. Milton spoke to the victim and then went to the victim's house where he met up with Phillip and C.J. Soon thereafter, Milton heard a gunshot and took off on his bike to see what happened. Milton saw someone running from the park but did not recognize the person. He then testified that it was the female that he had seen with the victim.

Milton's testimony regarding the identity of the person seen running from the

4

park changed. Milton stated he did not recall giving a statement to police indicating he saw a male dressed in black running from the park. Milton maintained that this was an error in the statement. Milton then testified that he remembered telling a detective that he saw someone wearing black and a hood over his head running from the park. Milton recalled telling a detective that the person was a man, but at trial, Milton was not certain that it was a man.

Shayla Prejean, a nearby resident, was a witness to the offense. Shayla testified that she heard people arguing outside and looked out of her bedroom window to see who was making the noise. The noise was coming from the area of a tree in the park near a bench. She was able to see three people arguing, one short person and two taller people, but she could not make out what they were saying. Before she heard the gunshot, she saw one of the taller people run from the park out of an entrance located further down the street.

Shayla then heard a gunshot and saw the shooter lay the victim down on the ground and then bend over the victim. She described the shooter as short and dark, with short dark hair, and dressed in all black clothing. The shooter then ran out of the park and passed in front of Shayla's bedroom window. With the help of a street light in front of her house, Shayla was able to see the shooter's face. Also, the shooter was carrying something in his left hand that was wrapped in dark-colored material. Shayla stated that the man was not sprinting, but was jogging.

Shayla identified Defendant in the courtroom to be the man she saw run from the park and past her window. She also testified that she identified Defendant in a police photo line-up. However, on the Line-Up Identification Form given to Shayla to complete, she did not circle any numbers to indicate that she recognized Defendant

5

in the photographic line-up. At the bottom of the form in the section for remarks, Shayla wrote, "Was unable to identify but #2 was the closest one to look like the person I saw." Despite the appearance of her uncertainty at the time of the offense, Shayla testified at trial that she told the police she was pretty sure that it was number two. Shayla also stated that she was never told to circle the number that corresponded to the person she identified. Lastly, Shayla indicated that Defendant was not wearing his hood so she was able to see his face "pretty clear." Shayla concluded at trial that there was no doubt in her mind that Defendant was the man she saw that night.

On appeal, Defendant contends that the testimony of the individuals involved is so riddled with inconsistencies that the testimony should not have been considered. While there do appear to be inconsistencies from one witness to another, the basic story amongst the individuals involved is consistent. Although Georgia testified that Norris, not Defendant, suggested the robbery earlier that day, she was not present at the time of the offense to implicate Norris as the shooter.

Additionally, Shayla, an eyewitness with no involvement in the offense or with the parties involved, identified Defendant as the shooter. Although Shayla indicated that she was "pretty sure" the man she saw was Defendant at the time she was shown the photo line-up, she testified at trial that she was certain of Defendant's identity and had no doubt in her mind that Defendant was the man she saw that night. Lastly, the fact that Shayla was only sixteen years old at the time of the offense was a fact presented to the jury and was considered in determining her credibility. The jury's role in this case, in part, was to weigh the respective credibility of the witnesses at trial. In light of the testimony in the record at hand, Defendant has not shown that the jury's credibility determinations should be second guessed. With the testimony

6

identifying Defendant as the perpetrator, we find that the State has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

## CRIME SCENE PHOTOS

In his last assignment of error, Defendant argues that the trial court erred in denying his request to exclude prejudicial crime scene photos. In support of his argument, Defendant refers to *State v. Eaton*, 524 So.2d 1194, 1201 (La.1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 818 (1989), wherein the supreme court summarizes the guidelines regarding the introduction of photographs as follows:

> The mere fact a photograph is gruesome does not in and of itself render a photograph inadmissible. The test of admissibility is whether the probative value outweighs any prejudicial effect which may result from the display to the jury. *State v. Comeaux*, 514 So.2d 84 (La.1987); *State v. Beach*, 320 So.2d 142 (La.1975); *State v. Morris*, 245 La. 175, 157 So.2d 728 (1963). Generally, photographs of a victim's body which depict the fatal wounds are relevant to prove the corpus delicti, to establish the identity of the victim, the location, severity and number of wounds, and to corroborate other evidence of the manner in which the death occurred. *Comeaux*, 514 So.2d at 96. The trial court's admission of an allegedly gruesome photograph will be overturned on appeal only if the prejudicial effect clearly outweighs the probative value. No error will be found unless the photographs are so gruesome so as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. *State v. Perry*, 502 So.2d 543 (La.1986).

In the instant case, Defendant contends that the post-mortem photographs of the victim were not needed to prove the *corpus delicti* or to identify the victim and, thus, had no probative value regarding the issues at hand. Defendant concludes the photos served only to inflame the passions of the jury.

The State submits that the photographs are far from gruesome and did not overwhelm the reason of the jurors, thereby leading them to convict Defendant without evidence. *State v. Perry*, 502 So.2d 543 (La.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 205 (1987). The State maintains that the photos depict the condition

7

of the victim's body, the position and general location of his body in the park, and the location of other items of evidence found at the scene. The State adds that the photographs depict the location, number, and positioning of the victim's wounds which were relevant to prove the *corpus delicti*.

At the beginning of trial, Defendant objected to photographs of the victim and offered to stipulate that the victim was shot and killed. Defendant argued that the photographs were too prejudicial and had no probative value regarding the gunshot wound to the head. Later at trial, Defendant reiterated his objection and added that repeatedly publishing them to the jury, with the victim's family members present, was prejudicial. Defendant also argued that the display of the photographs was cumulative, redundant, and inflammatory.

The State responded by asserting it had the right to have each witness testify pursuant to a photograph admitted into evidence and that it was obligated to have the photographs displayed to the jury. The State maintained that it could pass the photographs around to the twelve jurors which would stretch the trial out for weeks, or it could display the photographs through the use of Power Point. The State stressed that prior to trial, the family members present in court were prepared and informed that the photographs would be displayed, and they were told that they could leave the courtroom if needed.

The trial court overruled Defendant's objection, but opted to address the family members in court, stressing that they must maintain the integrity of the trial process. To prevent the jury from being too influenced by their emotions, the trial court requested that the family members refrain from showing outward emotion and

sobbing. The trial court asked them to step outside the courtroom if they felt they could not control their emotions while the photographs were being shown.

Four photographs of the victim at the crime scene were admitted into evidence. One photograph was taken of the victim from a distance and depicts the location of his body in the park. A park bench, tree, picnic table, and fence line can all be seen in the photograph. The victim is lying on the ground, but his injury is not apparent. Another photograph was taken closer to the victim from his left side. He is seen lying on his back with little to no evidence of his injury visible in the photograph. Another photograph taken at a similar distance as the second one shows the victim from his right side and again reveals very little evidence of his injury. A small amount of blood can be seen below his nose. The last photograph is a closeup of the victim's head from the left side of his face and reveals a small amount of blood under his nose and to the left of his nose. Also, a very small amount of blood can be seen at the area of the gunshot, but the wound, measuring one-eighth of an inch and located two and one-half inches from the top of his head and four inches from the front of his head, is mostly obscured by the victim's hair. As noted in the victim's autopsy report, the defect from the injury had no abrasion ring, no soot, and no stippling.

Considering the content of the photographs, along with the trial court's instructions to the family members to maintain the integrity of the proceeding, the trial court did not err in denying Defendant's motion to exclude the evidence. Although the victim died as a result of the gunshot, the photographs did not depict a bloody crime scene or an offensive component such as decomposition. Additionally, the photographs were relevant in proving the *corpus delicti* as well as depicting the

location of the victim's body in the park, the position of his body, and the location of his wounds. Accordingly, this assignment of error is without merit.

**_____DECREE**

For the foregoing reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.