ROLAND L. BELSOME, Judge.
 

 1 Defendant-Appellant, Avery Young, appeals the trial court’s denial of his motion to withdraw his guilty plea. For the reasons that follow, we affirm the conviction, vacate the sentence, and remand to the trial court for the purpose of conducting an evidentiary hearing.
 

 STATEMENT OF THE CASE
 

 On August 25, 2009, Defendant was charged with second-degree kidnapping (count one). On September 1, 2009, he entered a plea of not guilty. On October 28, 2009, following a Prieur
 
 [1]
 
 hearing, the trial court granted the motion in part and denied the motion in part. The trial court clarified with the state and the defense what testimony could be introduced at trial.
 
 [2]
 
 On July 12, 2010, the state filed a motion to use evidence of similar crimes; the motion was denied.
 
 [3]
 
 The state filed a motion of intent to use an expert witness; the motion was granted. Both the state and the defense filed motions
 
 in limine
 
 agreeing to allow testimony about the victim’s past relationship with defendant, but not other relationships. The state filed a motion to use a first reporter witness; the motion was granted.
 

 |2The state amended the bill of information to add forcible rape (count two) and amended the wording and date of the offense. Defendant pleaded not guilty to the amended bill of information. Trial began on July 13, 2010 and was continued to July 14, 2010. On July 14, 2010, the state dismissed the forcible rape charge. Defendant pleaded guilty to second-degree kidnapping. On August 20, 2010, the defense filed a motion to appoint a sanity commission; the motion was granted. On August 26, 2010, following a sanity hearing, the trial court found Defendant competent to proceed. The defense filed a motion to withdraw the plea of guilty; the motion was denied. The defense filed a motion to stay the sentencing; the motion
 
 *568
 
 was denied. The defense noted its objection.
 

 Defendant was sentenced to serve fifteen years at hard labor with credit for time served and concurrent with his parole revocation sentence in Section “C” but without benefit of parole, probation, or suspension of sentence for the first two years. On August 30, 2010, the trial court denied the motion to reconsider the sentence. This appeal followed.
 

 FACTS
 

 R.C., the victim, testified at length during Defendant’s trial. R.C. testified that she met Defendant while she and her sister were apartment hunting in the Mid-City area of New Orleans. When R.C. and her sister stopped to inquire about a rental, Defendant approached them, and a conversation ensued. Defendant telephoned his mother about the rental. During the conversation, R.C.’s sister and Defendant learned that they had mutual interests in photography and gardening, and exchanged phone numbers. Approximately one month later, the two women leased the apartment. In April of 2009, R.C. and Defendant began a romantic relationship.
 

 | sIn July 2009, Defendant underwent eye surgery. R.C. went to Defendant’s house to visit with him after his surgery, and stayed from approximately 7:00 p.m. to 10:30 p.m. During that time, Defendant and R.C. engaged in consensual sexual intercourse. R.C. left Defendant’s house to meet with some out-of-town friends. R.C. returned to Defendant’s house at approximately 2:50 a.m., two hours later than she had advised Defendant that she would return. Defendant began to berate her for being late, and a verbal altercation ensued.
 

 R.C. advised defendant that she was leaving the house. Defendant slammed R.C. against the bedroom door and locked the deadbolt, blocking her exit. Defendant threw R.C. to the floor and placed his knee on her ribcage, as well as a chokehold on R.C.’s neck. As she began to lose consciousness, Defendant told R.C. that she would now know how it would to feel to die. Maintaining the chokehold, Defendant picked up R.C. and placed her on the bed. Defendant repeatedly choked and slapped R.C. across the face until she lost consciousness.
 

 Defendant continued to interrogate R.C., acting as though he was going to punch her in the face, then repeatedly slapping her with an open hand to prevent bruising. She sustained numerous cuts to the inside of her mouth which bled onto her sweatshirt. When R.C. tried to scream to get the attention of the downstairs tenant, Defendant obstructed R.C.’s breathing and told her that he would throw her out of the window if she tried to scream again. Defendant then produced hand restraints that he had used for sex play, restrained R.C.’s hands behind her back, and placed her onto the bed, advising her that this was her last day on earth and that he was going to kill both of them.
 

 R.C. suggested to Defendant that he consider the consequences of his actions, to which he responded that there would be no consequences because they |4both were going to die. At one point, R.C. expressed to Defendant that she needed to use the toilet, which he allowed, but did not permit her to clean herself. Defendant then retrieved a set of shackles, removed R.C.’s clothing and shackled her to the bed.
 
 [4]
 

 R.C. asked Defendant for a blanket and some water, as her mouth was bleeding.
 
 *569
 
 Defendant denied her requests, punching R.C. several times in her solar plexus area, causing her to lose her breath, advising her that it was her last day on earth. After R.C. apologized to Defendant and expressing that she had wronged him, Defendant played R.C.’s favorite movie soundtrack. Upon hearing the music, R.C. began to cry and told Defendant she deserved to be punished; only then did Defendant give R.C. the blanket and water that she requested. He also gave her an over-the-counter painkiller when she complained of pain in her ribs and difficulty breathing. Defendant then placed a Klo-nopin pill in R.C.’s mouth, which she spit out. Defendant forced the pill into her mouth until it dissolved, and R.C. lost consciousness.
 

 When R.C. awoke at approximately 6:00 a.m., she was still restrained. Despite R.C.’s adamant protests, Defendant raped R.C., and she lost consciousness again. When R.C. subsequently awoke some time later, Defendant was holding her, and she was no longer restrained. R.C. confronted Defendant about the rape, at which time Defendant began to cry and apologized for his actions. Defendant refused to allow her to leave the apartment until R.C. explained that people were expecting her and that if she did not arrive, they would become alarmed. Defendant handed R.C. her cell phone, which he had placed out of her reach, and 15watched as she sent a text message to her sister explaining that their appointment to see an apartment would have to be rescheduled. R.C. then contacted the apartment manager to reschedule the appointment. Defendant retrieved the cell phone and again placed it out of R.C.’s reach.
 

 R.C. told Defendant that because he raped her, their relationship was over, and Defendant began to cry, explaining that he was abused as a child, and that because he did not have a childhood, all he wanted was a baby. Defendant then told R.C. that he would allow her to leave on the condition that she would bear his child. Desperate to escape, R.C. agreed. After they engaged in sexual intercourse, R.C. and Defendant left the apartment together. Defendant insisted that he drive R.C. home so that he could then bring her back to his apartment; he also refused to return her cell phone. Defendant drove to a restaurant in the French Quarter.
 

 Under the pretext of calling the apartment manager, R.C. retrieved her cell phone from Defendant. She entered the restaurant and sent a text message to her sister informing her that Defendant had raped her and to contact Defendant’s mother, Veronica Young. R.C. erased the message and warned her sister not to respond because Defendant was reading her text messages. Defendant entered the restaurant and asked R.C. if she had contacted his mother; she answered in the affirmative. After R.C. advised Defendant that their relationship was over, he left the restaurant.
 

 Shortly thereafter, R.C.’s sister arrived at the restaurant, at which time R.C. related what had occurred. That evening, R.C.’s sister and her friends convinced R.C. to report the rape to the police and to also go to the hospital. At the hospital, [fiR.C.’s injuries were treated, and a sexual assault examination was performed. R.C. also spoke at length with a sexual assault nurse examiner (“SANE”).
 
 [5]
 

 
 *570
 

 ERRORS PATENT
 

 A review of the record reveals no errors patent.
 

 DISCUSSION
 

 Defendant asserts two assignments of error for review. First, Defendant submits that the trial court abused its discretion in denying his motion to withdraw his plea of guilty; second, Defendant argues that the trial court erred denying his motion to withdraw without conducting an evidentiary hearing.
 

 In support of his argument, Defendant contends that his guilty plea was not knowingly and voluntarily entered. Specifically, as stated in his affidavit accompanying the motion to withdraw, Defendant argues that his plea was a product of coercive influences which overwhelmed the will of a psychologically weak and emotionally distraught person. Defendant further contends that the report of the forensic psychologist, Marc L. Zimmerman, Ph.D., M.P., supports a finding that his plea agreement was not a rational choice and was not made in a knowing and voluntary manner, but was instead entered out of panic consistent with Defendant’s medical history of making confused and irrational decisions. This state of panic, he argues, resulted from his inability to adequately confer with his parents regarding the terms of the plea agreement and Defendant’s perception that |7his attorney had become medically incapacitated during the trial.
 
 [6]
 
 Additionally, Defendant submits that he perceived his counsel’s cross-examination of R.C. as ineffective and that such ineffective cross-examination would lead to Defendant’s conviction on both charges.
 

 Defendant also submits that his counsel neither explained the possible option of a plea pursuant to
 
 Crosby,
 

 [7]
 

 nor the elements of second-degree kidnapping. Defendant also argues that his counsel was unable to locate a critical witness, and insists that the facts do not support the charge of second-degree kidnapping. Accordingly, Defendant asserts that pursuant to the totality of the circumstances test, the trial court should have conducted an evidentia-ry hearing before denying his motion to withdraw his guilty plea.
 

 Article 559 provides that a court “may permit a plea of guilty to be withdrawn at any time before sentence.” La. C.Cr.P. art. 559(A). Likewise, the Louisiana Supreme Court in
 
 State v. Lewis,
 
 421 So.2d 224 (La.1982), held that a trial court may permit the withdrawal of a guilty plea after sentencing if the court finds that the guilty plea was not entered freely and voluntarily, or if there was an inadequate colloquy advising the defendant of the rights he was waiving by pleading guilty and therefore was constitutionally infirm. There is “no absolute right to withdraw a previously entered plea of guilty.”
 
 State v. Pichon,
 
 96-0886, p. 2 (La.App. 4 Cir. 11/20/96), 684 So.2d 501, 502. The withdrawal of a guilty plea is within the discretion of the trial court and is subject to reversal only if that discretion is abused or arbitrarily exercised.
 
 State v. Johnson,
 
 406 So.2d 569 (La.1981);s
 
 State v. Rhea,
 
 2004-0091 (La.App. 4 Cir. 5/19/04), 876
 
 *571
 
 So.2d 181,
 
 writ denied,
 
 2004-0901 (La.10/1/04), 888 So.2d 1005.
 

 For a guilty plea to be found valid, there must be a showing that the defendant was informed of and waived his constitutionally guaranteed right to trial by jury, right of confrontation and right against compulsory self-incrimination.
 
 Boykin v. Alabama,
 
 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969);
 
 State ex rel Jackson v. Henderson,
 
 260 La. 90, 255 So.2d 85 (1971). In determining whether the defendant’s plea is knowing and voluntary, the court must not only look to the colloquy concerning the waiver of rights, but also other factors which may have a bearing on the decision.
 
 State ex rel La-Fleur v. Donnelly,
 
 416 So.2d 82 (La.1982);
 
 State v. Galliano,
 
 396 So.2d 1288 (La. 1981);
 
 see also State v. Calhoun,
 
 96-0786 (La.5/20/97), 694 So.2d 909. Similarly, in reviewing whether the trial court abused its discretion, courts have looked to the guilty plea colloquy to determine whether the defendant was advised of the consequences of his plea and whether he voluntarily qnd intelligently waived his rights.
 
 Id.
 

 For example, in
 
 State v. Blanchard,
 
 2000-1147 (La.4/20/01), 786 So.2d 701, the defendant alleged that his guilty pleas to sex offenses were not intelligently made because: (1) he mistakenly believed that he could avoid the sex offender registration requirements; (2) the State’s late production of other crimes evidence rendered his subsequent plea involuntary; and (3) he pled guilty at counsel’s urging because counsel was hesitant to cross-examine a victim because counsel knew members of the victim’s family. The trial court denied the motion to withdraw his pleas, but the appellate court reversed. The Louisiana Supreme Court reversed after determining that the transcripts of the colloquy revealed that the pleas were given in exchange for the State’s agreement to reduce the charges. The |9Court found that the colloquy also reflected that the trial court conducted a thorough plea colloquy with the defendant, fully advised him of the trial rights he was waiving, and obtained defendant’s assurances that he understood his trial rights, that he was waiving them voluntarily, and that he was satisfied with the representation he had received from defense counsel.
 

 In
 
 State v. Johnson,
 
 406 So.2d 569 (La.1981), the trial court denied the defendant’s motion to withdraw his guilty plea, which he filed prior to sentencing. The defendant based his motion on his claim that he was intimidated into pleading guilty. The Louisiana Supreme Court reviewed the plea colloquy and noted that the trial court had meticulously explained the defendant’s rights, which he waived, and the possible consequences of the plea. The Court found that colloquy thus established that the defendant’s plea was voluntarily given. The Court also noted that during an evidentiary hearing on the motion to withdraw the plea, the defendant failed to show that his plea was the product of intimidation.
 

 In
 
 State v. Rhea, supra,
 
 the defendant
 
 pro se
 
 moved to withdraw his guilty plea because he contended that his counsel intimidated him into pleading guilty because she “feared” going to trial and told him that it was in his best interest to take the plea and then file for post-conviction relief, during which time she would represent him. The defendant also alleged in his motion that counsel was ineffective for her fear of going to trial and that there was no factual basis for his plea. This court found that the plea bargain offered by the State, to reduce several counts for which he originally was subject to mandatory life sentences and to dismiss other counts, was indeed in the defendant’s best interest.
 
 *572
 
 Additionally, this court rejected the defendant’s allegation that it was his attorney’s fear of trial that coerced him into pleading guilty.
 

 Jjnln this case, in the middle of trial, defense counsel and the State announced to the trial court that a plea had been reached. Prior to taking the plea, the trial court noted that the State agreed to dismiss the forcible rape charge and promised not to file a multiple bill of information against defendant in exchange for Defendant pleading guilty to second-degree kidnapping with a sentence of fifteen years at hard labor. The court conducted a lengthy colloquy during which it fully complied with the requirements of
 
 Boykin v. Alabama, supra,
 
 and with the statutory requirements of La.C.Cr.P. art. 556.1. The court fully advised Defendant of his riShts and established that Defendant had knowingly waived them.
 
 [8]
 
 The court further confirmed that Defendant understood that only the promises made to him in connection with the plea bargain were enforceable. The court stated that it intended to sentence Defendant to serve fifteen years at hard labor with the first two years to be served without benefit of parole, probation or suspension of sentence. The trial court also established that the plea was not the product of any
 
 *573
 
 force, threats, or coercion.
 
 [9]
 

 Furthermore, when the court asked Defendant if he was satisfied with his attorney and his representation, he answered in the affirmative.
 
 [10]
 
 The court found that there was a basis in law and fact for the plea, and it accepted the plea. The transcript also reflects that Defendant clearly responded to all questions posed by the trial court, and does not indicate that Defendant engaged in behavior that would indicate to the trial court that he was distraught, panicked or dissatisfied during the plea colloquy. In denying the request for an evidentiary hearing, the trial court stated:
 

 I don’t believe an evidentiary hearing is necessary. I was the presiding Judge over the original trial. I was he[re] for all the circumstances under which this plea of guilty was taken. It is, in fact, a plea bargain agreement that was discussed extensively between the State and the Defense. I’ll deny your stay.
 

 Notably, Defendant was found to be competent at the time he entered his plea of guilty. On August 26, 2010, Dr. Rafael Salcedo, a forensic psychologist, met with Defendant and Dr. Richoux, the other member of the court-appointed Insanity commission. At the competency hearing, Dr. Salcedo testified that while he agreed that Defendant exhibited symptoms of post-traumatic stress disorder from a history of sexual trauma, the disorder was not the type that would so gravely impair an individual such that it would render a person incapable of understanding that he was entering a guilty plea. Additionally, Dr. Salcedo testified that there was no evidence that Defendant suffered from a psychiatric disorder at the time he entered his guilty plea on July 16, 2010 that would have impaired his ability to freely and voluntarily enter his plea. Specifically, he testified that “an individual’s ability to understand the difference between entering a guilty plea and a not guilty plea is such a basic simple fundamental one that it would require either severe mental retardation or severe psychosis to override that.... Mr. Young did not report psychotic symptoms.” Dr. Salcedo characterized post-traumatic stress disorder as only one of the
 
 State v. Bennett
 
 criteria employed to determine whether a defendant is competent to proceed.
 
 [11]
 

 
 *574
 
 11sHowever, Dr. Zimmerman, a forensic psychologist who also examined Defendant, reached differing conclusions with respect to Defendant’s mental state. Specifically, Dr. Zimmerman submitted a written report in which he concluded that Defendant’s decision to enter a guilty plea was not made in a knowing and voluntary manner, and that Defendant may have been suffering from difficulties which rendered him unable to fully grasp the court proceedings and unable to assist his attorneys. Dr. Zimmerman also found that Defendant’s plea was not a rational choice, but was rather a decision made out of panic and consistent with his history of making confused and irrational decisions. Defense counsel asserts that in addition to Dr. Zimmerman, counsel intended to call Defendant’s parents, attorneys Robert Glass and Jeffrey Smith (Defendant’s trial counsel), as well as Defendant to testify at the evidentiary hearing.
 

 | ^Although the trial court conducted a thorough and detailed colloquy with Defendant regarding his guilty plea, the trial court was obligated to conduct an eviden-tiary hearing with regard to Defendant’s assertion that the plea was made involuntarily. Accordingly, we find that the trial court abused its discretion in denying the request for an evidentiary hearing under these facts and circumstances.
 
 See State v. Green,
 
 94-617, p. 3 (La.App. 3 Cir. 12/7/94), 647 So.2d 536, 538, (noting that “[i]f a motion for withdrawal of a guilty plea contains specific allegations that the guilty plea was involuntary, the Boykin colloquy was defective, there was a breach of the plea bargain agreement, or some other specific allegation that the plea is constitutionally infirm, the trial court should vacate the plea or conduct a hearing on the matter”)(emphasis added). The matter is thus remanded to the trial court to conduct an evidentiary hearing in connection with Defendant’s motion to withdraw his guilty plea.
 

 Additionally, Defendant argues that the motion to withdraw his guilty plea should have been granted because the bill
 
 *575
 
 of information fails to state a crime committed under a valid statute. Specifically, Defendant argues that reading the individual subparts of La. R.S. 14:44.1 with the statute as a whole, a fair interpretation is that where the prosecution is based on subpart A(3), where the victim is physically injured, the statute is violated when the victim was imprisoned without a weapon for more than seventy-two hours, or when the physically injured victim was imprisoned for any length of time with the use or perceived use of a weapon. Here, Defendant asserts that the imprisonment was for less than seventy-two hours, and that no weapon or perceived weapon was used. Accordingly, he argues that given these facts, he cannot be convicted of second-degree kidnapping.
 

 11fiLa. R.S. 14:44.1, in pertinent part, provides:
 

 A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
 

 (1) Used as a shield or hostage;
 

 (2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;
 

 (3) Physically injured or sexually abused;
 

 (4) Imprisoned or kidnapped for seventy-two or more hours, except as provided in R.S. 14:45(A)(4) or (5); or
 

 (5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
 

 B. For purposes of this Section, kidnapping is:
 

 (1)The forcible seizing and carrying of any person from one place to another; or
 

 (2) The enticing or persuading of any person to go from one place to another; or
 

 (3) The imprisoning or forcible secreting of any person.
 

 A simple reading of La. R.S. 14:44.1 reflects that any one of the elements enumerated in Subpart B combined with any of the elements enumerated in Subpart A completes the crime of second-degree kidnaping. The bill of information as amended prior to trial charges defendant with “committing second-degree kidnapping of R.C., wherein R.C. was physically injured while imprisoned.” Thus, the bill of information charged defendant with a crime under a valid statute. Furthermore, Defendant’s claim that the facts do not support the charge is a claim of sufficiency of the evidence. Because Defendant failed to file a motion to quash the bill of information, prior to trial, any claim of sufficiency is hnthus waived on appeal.
 
 See
 
 La.C.Cr. P. arts. 531, 532, and 535;
 
 see also State v. Johnson,
 
 2007-1397 (La.App. 4 Cir. 6/4/08), 985 So.2d 1259.
 

 CONCLUSION
 

 For the foregoing reasons, Defendant’s conviction is affirmed. Defendant’s sentence is hereby vacated and the matter remanded for the purpose of conducting an evidentiary hearing in connection with Defendant’s motion to withdraw his guilty plea.
 

 CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED
 

 [1]
 

 .
 
 State v. Prieur,
 
 277 So.2d 126 (La.1973).
 

 [2]
 

 . Both the State and the defense objected and noticed intent to file writs; however, on December 4, 2009, both the State and the defense informed the trial court that they would not file writs.
 

 [3]
 

 .The State objected and gave its notice to file writs; however, no writs were filed.
 

 [4]
 

 . R.C. testified that this set of shackles restrained both her arms and her legs so that she was in an "X” shape.
 

 [5]
 

 . Corey Lymous, a detective with the NOPD sex crimes unit, also testified regarding the rape investigation, which was initiated after the sexual assault nurse contacted the police department as R.C. was being discharged from the hospital. Detective Lymous testified that Defendant was initially arrested for domestic violence and false imprisonment based
 
 *570
 
 upon R.C.'s initial report to the police; Defendant was thus already incarcerated at the time that he was subsequently charged with forcible rape.
 

 Jeanne Dumestre, the SANE nurse who examined R.C., also testified as an expert in the field of sexual assault examination.
 

 [6]
 

 . Defendant contends that Robert Glass' diagnosis of Parkinson’s disease was not disclosed to him until the day before the plea agreement proceedings.
 

 [7]
 

 .
 
 State v. Crosby,
 
 338 So.2d 584 (La.1976).
 

 [8]
 

 . The trial court confirmed that Defendant understood and knowingly waived his rights in connection with his guilty plea:
 

 THE COURT: Do you understand you have a right to a trial by Judge or Jury and, if convicted, a right to appeal and by entering a plea of guilty in this case you are waiving your rights to trial and appeal?
 

 MR. YOUNG: Yes, ma’am.
 

 [[Image here]]
 

 THE COURT: You understand that by pleading guilty you waive your right to confront and cross examine the witnesses who accuse you of this crime and the compulsory process of the Court to require witnesses to appear and testify for you?
 

 MR. YOUNG: Yes, ma'am.
 

 ⅝ ⅛ * ⅝
 

 THE COURT: Do you further understand that by pleading guilty you waive your rights against self-incrimination, that at your trial you would not have to testify and if you had not testified myself or the Jury would not have held your silence against you, and you also give up the right not to say anything against your interests such as you do by pleading guilty?
 

 MR. YOUNG: Ido.
 

 THE COURT: Do you understand that if you elected to have a trial, you would have had the right to have competent counsel represent you at trial and if you had been unable to pay for counsel, I would have appointed competent counsel to represent you, but by entering a plea of guilty, you waive those rights?
 

 MR. YOUNG: Yes, ma'am.
 

 THE COURT: Do you understand that you are entitled to a free transcript of this Boy-kin proceeding and you are hereby waiving your right to the free transcript?
 

 MR. YOUNG: Yes, ma'am.
 

 THE COURT: Do you understand there is a 30-day limit to appeal this conviction and a two-year time period during which to seek post-conviction relief?
 

 MR. YOUNG: Yes, ma’am.
 

 [[Image here]]
 

 THE COURT: Finally, do you understand that this plea of guilty may be used in a present or future prosecution and may subject you to prosecution as a multiple offender and/or subject you to an enhanced sentence?
 

 MR. YOUNG: Yes, ma’am.
 

 THE COURT: Now, when you went over this form with your attorneys, they asked you to put your initials on the left side of the document to indicate — excuse me — to indicate that you understood what it was you were pleading guilty to, what your sentence was going to be and the rights you were giving up as a result of entering your plea of guilty.
 

 Now, I ask you on the record: Are these your initials here (indicating)?
 

 MR. YOUNG: Yes, they are.
 

 THE COURT: And is this your signature here?
 

 MR. YOUNG. It is. •
 

 [9]
 

 . Defendant testified as follows:
 

 THE COURT: Are you entering a plea of guilty to this crime because you are, in fact, guilty?
 

 MR. YOUNG: lam.
 

 THE COURT: Have you been forced, threatened or intimidated into making this plea?
 

 MR. YOUNG: I have not.
 

 [10]
 

 . The colloquy with regard to Defendant's satisfaction with his representation is as follows:
 

 THE COURT: Are you fully satisfied with the handling of your case by your attorneys and the way in which they have represented you?
 

 MR. YOUNG: Quite, yes.
 

 [11]
 

 . In
 
 State v. Bennett,
 
 the Louisiana Supreme Court specified the applicable criteria in a competency determination:
 

 Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused’s ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense;
 
 *574
 
 whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
 

 State v. Bennett,
 
 345 So.2d 1129, 1138 (La.1977).
 

 In
 
 State v. Silva,
 
 this court recognized the
 
 Bennett
 
 criteria for determining competency to proceed:
 

 Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense. LSA-C.Cr.P. art. 641. The two-fold test of capacity to stand trial under this article is whether the accused 1) understands the consequences of the proceedings, and 2) has the ability to assist in his defense by consultation with counsel.
 
 Drope v. Missouri,
 
 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975);
 
 State v. Bennett,
 
 345 So.2d 1129 (La.1977). Mental retardation or sub-normal intelligence is not in itself proof of incapacity.
 
 State v. Lawrence,
 
 368 So.2d 699 (La.1979). The decision as to a defendant’s capacity to proceed should not turn solely on whether he suffers from mental disease or defect, but must be grounded in the nature of the charge, the complexity of the case and the seriousness of the decisions he faces.
 
 State v. Narcisse,
 
 426 So.2d 118 (La.1983),
 
 cert.denied,
 
 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983).
 

 Because Louisiana law presumes a person sane and responsible for his actions, the defendant bears the burden of proving he is incapable of standing trial because of mental disease or defect.
 
 State v. Bennett, supra.
 

 State v. Silva,
 
 96-0407 (La.App. 4th Cir. 9/3/97), 699 So.2d 487, 490-491.